368 A.2d 626
**COMMONWEALTH of Pennsylvania**
v.
**Theodore BROWN, Appellant.**

*Supreme Court of Pennsylvania.*

Argued Nov. 21, 1975.

Decided Oct. 8, 1976.

Rehearing Denied Feb. 11, 1977.

276

Joseph Michael Smith, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., for appellee.

Before EAGEN, O'BRIEN, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

NIX, Justice.

On May 19, 1969, Robert Carter was shot and killed inside the Opus I Bar at North Twenty-Seventh Street in the City of Philadelphia. Theodore Brown, appellant,

was arrested and charged with the offense. The first trial commenced on October 14, 1970, and resulted in a mistrial because of the jury's inability to agree upon a verdict. At the second trial, a verdict of murder of the second degree was returned. This conviction was reversed by order of this Court in an opinion filed March 16, 1973, because of the introduction of a confession that was found to be the product of an illegal arrest. *Commonwealth v. Brown,* 451 Pa. 395, 301 A.2d 876 (1973). At the third trial, Mr. Brown was again convicted of murder of the second degree. Post-trial motions were filed, argued and denied. This direct appeal followed.[1]

Appellant's first assignment of error is that Pennsylvania Rule of Criminal Procedure 1100(e) has been violated. Rule 1100(e) provides:

"A new trial shall commence within a period of ninety (90) days after [an] entry of an order by the trial court or an appellate court granting a new trial."[2]

The order of this Court awarding the new trial was entered in March of 1973. Rule 1100 was adopted June 8, 1973. There is a dispute as to whether the retrial was in fact "commenced" within 90 days of the adoption of Rule 1100. This issue need not here be considered however in view of our determination that Rule 1100(e) was not applicable in this case.

▮ Appellant argues that the prospective application of Rule 1100 is applicable only to original trials and does not apply to paragraph (e) which pertains to retrials. This argument is premised upon the fact that paragraphs (a)(1) and (a)(2) of the Rule expressly set forth the effective dates of their operation and paragraph (e) fails to contain such a declaration. The argument fails however to recognize the clear intention that the *entire*

1. See, Appellate Court Jurisdiction Act, 1970, July 31, P.L. 673, No. 223, art. II, § 202, 17 P.S. § 211.202.

2. This section was subsequently amended to provide for a period of one hundred and twenty (120) days.

Rule was only to be given prospective application. The accompanying explanatory note and the comment to the Rule both expressly provide that the provisions of the Rule should be effective prospectively from the date of the adoption of the Rule, June 8, 1973. See also, *Commonwealth v. Bailey,* 463 Pa. 354, 361, n.6, 344 A.2d 869, 873, n.6 (1975); *Commonwealth v. Lee,* 460 Pa. 374, 379, n.2, 333 A.2d 773, 776, n.2 (1975); *Commonwealth v. Roundtree,* 458 Pa. 351, 355, n.6, 326 A.2d 285, 287, n.6 (1974).

Such a view is also consistent with the opinion of this Court in *Commonwealth v. Hamilton,* 449 Pa. 297, 297 A.2d 127 (1972), wherein we first announced our intention to promulgate a rule which would establish a presumptive time period within which defendants in this State must be tried. In *Hamilton, supra,* after setting forth the reasons why we believed it to be necessary to develop a presumptive rule in lieu of the "balancing test" set forth by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), we stated:

> ". . . we deem it expedient to formulate a rule of criminal procedure fixing a maximum time limit in which individuals accused of crime shall be brought to trial, *in the future,* in this Commonwealth." (Emphasis added). *Commonwealth v. Hamilton, supra* at 308–309, 297 A.2d at 133.

Although Rule 1100 was adopted in an effort to provide defendants in this Commonwealth with a greater protection than the minimum requirements of the Federal Constitution, see *Commonwealth v. Whitaker,* 467 Pa. 436, 359 A.2d 174 (filed May 12, 1976), we recognized the stress that this new procedural requirement would create upon the administration of justice within the Commonwealth and therefore attempted to avoid serious disruption by confining its application to future cases. The distinction in the differing prospective applications

found in paragraphs (a)(1) and (a)(2) was necessitated by the large number of cases which were anticipated to fall within those categories. It was equally clear that the number of cases that would fall within the ambit of paragraph (e) would be far less than the number of cases anticipated to fall within either paragraphs (a)(1) or (a)(2). Therefore, the need to stagger the applicability of the Rule as it applied to original trials was not present in the case of retrials. Thus, both paragraphs (a)(1) and (a)(2) have different standards of prospective application from paragraph (e), but all three paragraphs were nonetheless clearly intended to be prospective in application.

■■ Although this precise issue has not been previously raised, we did have occasion in *Commonwealth v. Woods,* 461 Pa. 255, 336 A.2d 273 (1975) to state:

"Because it is the entry of an order granting a new trial which starts the 90 day time limit in paragraph (e) running, *that paragraph is applicable to any court case in which such an order is entered after June 8, 1973, the date of adoption of Rule 1100.*" (Emphasis added). *Id.* at 258, 336 A.2d at 274.

Appellant contends that it would offend due process to interpret paragraph (e) to be exclusively prospective. This argument is most difficult to comprehend in view of their implicit acceptance of the constitutionality of a purely prospective application in the case of original trials. We have been offered no reason, nor do we know of any, why due process would mandate retroactive application as to retrials and yet allow prospective application as to original trials. Clearly in each instance we are concerned with procedural rules which by their nature do not demand retroactive application. *Williams v. United States,* 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971); *Desist v. United States,* 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); *Stovall v. Denno,* 388 U.S.

293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); *Tehan v. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1965); *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

Appellant's second assignment of error is that the court improperly admitted the testimony of Samuel Winns, a Commonwealth witness, and allowed the introduction of the murder weapon. It is argued that the Commonwealth secured this evidence as a result of information received from the illegally obtained confession and therefore under the fruits of the poisonous tree doctrine, this evidence was tainted by the original illegality. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

It is asserted that the Commonwealth first became aware that Winns possessed information relating to the incident during the illegal questioning of appellant. It is further contended that the location of the murder weapon was ascertained through the subsequent questioning of Winns. The Commonwealth disputes this contention claiming that they had learned of Winns from an independent source. Cf., *Commonwealth v. Daniels,* 470 Pa. 523, 368 A.2d 1279 (filed November 1975).[3] We need not resolve this dispute because we find that for reasons we will now discuss, the application of an exclusionary rule is not here appropriate.

3. In connection with the investigation following these crimes, a youth named Major Smith was questioned. The police found this witness as a result of information they had gathered independent of appellant. As a result of this interview, the police were directed to Larry Cain who in turn supplied them with information concerning Winns. Although the suppression court predicated its result upon a finding that the police ferreted out and questioned Winns as a result of the information supplied by Major Smith and not appellant, we are not satisfied, after a careful study of this record, that such a finding was justified. In our judgment it is unclear whether Winns was contacted as a result of the questioning of Smith and Cain or appellant.

■ The exclusionary rule originated to deter unlawful police practices by depriving law enforcement officials of the benefits derived from using unlawfully obtained information. *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).[4]

■ Where, however, the admission of the proffered evidence does not represent an exploitation of the unlawful police practices the exclusion of relevant testimony would serve only to frustrate the objectives of the adjudicative process without providing any enhancement of that process, e.g., *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Commonwealth v. Cephas*, 447 Pa. 500, 291 A.2d 106 (1972); *Commonwealth v. Bishop*, 425 Pa. 175, 228 A.2d 661 (1967).

In *Silverthorne, supra* Mr. Justice HOLMES wrote:

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, . . . ". 251 U.S. at 392, 40 S.Ct. at 183.

Further elucidation of this concept is found in Mr. Justice FRANKFURTER's opinion in *Nardone, supra*:

"Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint." 308 U.S. at 341, 60 S.Ct. at 268.

4. See Maguire, "How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule:, *55 J.Crim.L.C. and P.S. 307, 308 (1964).*

In *Commonwealth v. Cephas, supra,* we did apply the rule of exclusion because we found:

"Prior to the time of the illegal search the police had no knowledge that Anne Mangini was involved in any illegality, nor were they in any way aware that she could aid the police in implicating appellant in any criminal activity . . . given the facts of the instant record *it is not unreasonable to say that except for the unlawful search she may never have become available as a witness."* (Emphasis added) *Id.* at 507, 291 A.2d 109–110.

We reached a contrary result in *Commonwealth v. Garvin,* 448 Pa. 258, 293 A.2d 33 (1972), where we concluded that the evidence secured through the illegality should nevertheless have been admitted where it was obvious that without the illegality the Commonwealth would have obtained the information.

"Although we agree with appellant as to the illegality of the arrest we must disagree with his contention that the identifications must be suppressed. No law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accusors. Thus, we conclude that the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome." *Id.* at 264, 293 A.2d at 37.

In the brief submitted on behalf of appellant it is conceded that the police had an independent source for securing the identity of Mr. Winns and ascertaining the location of the murder weapon.

"We do not suggest that the police would not have learned of Sam Winns without appellant's confession. To the contrary, we felt quite certain that they would have learned of Sam Winns and doubtless would have questioned him."

■ This concession is fully supported by the record. Prior to the examination of appellant, the police had questioned a witness by the name of Major Smith. As a result of this interrogation the police had been directed to a Larry Cain. Cain was questioned by a detective who was not aware of the statements made by appellant and Cain supplied the officer virtually the same information concerning Sam Winns as that given to them by appellant. Thus, although Cain was interviewed after the questioning of appellant, the information obtained from Cain relating to Winns was clearly independent of any statement made by appellant.

■ Where the initial taint did not effect the reliability of the evidence, the only basis for excluding relevant testimony is to discourage unlawful police practices by preventing the exploitation by police of their improper acts. However, where the prosecution can establish that the challenged evidence would have come to its attention from an independent source free of the taint, there is not the type of exploitation of the illegality that requires the imposition of the rule of exclusion. Restated, where the evidence obtained as the result of illegal police activity would have been discovered in the course of a lawfully conducted investigation, no purpose is served in applying the exclusionary rule. *Lockridge v. Superior Court*, 3 Cal.3d 166, 170, 89 Cal.Rptr. 731, 474 P.2d 863 (1970).[5]

Numerous federal decisions have adopted this view. For example, the Second Circuit rejected a claim that a witness whose identity was learned from the defendant's suppressed statement, was the fruit of the poisonous tree and therefore should have been held inadmissible.

". . . it is well established that the fruit of unlawful evidence may nevertheless be admitted if the

5. See generally, "Fruit of the Poisonous Tree—A Plea for Relevant Criteria," 115 *U.Pa.L.Rev.* 1136 *(1967)*; Maguire, "How to Unpoison the Fruit—the Fourth Amendment and the Exclusionary Rule", 55 *J.Crim.L.C. and P.S.* 307 *(1964)*.

government demonstrates that the evidence would have come to its attention from an independent source . . ." *United States v. Nagelberg,* 434 F.2d 585 (1970), cert. denied, 401 U.S. 939, 91 S.Ct. 935, 28 L. Ed.2d 219 (1971).

See also, *United States v. Resnick,* 483 F.2d 354, 356 (5th Cir. 1973) ; *Gissendanner v. Wainwright,* 482 F.2d 1293, 1297 (5th Cir. 1973); *United States v. Seohnlein,* 423 F.2d 1051 (4th Cir. 1970) ; *Killough v. United States,* 119 U.S.App.D.C. 10, 336 F.2d 929 (1964); *Wayne v. United States,* 115 U.S.App.D.C. 234, 318 F.2d 205, 209, cert. denied, 375 U.S. 860, 84 S.Ct. 125, 11 L. Ed.2d 86 (1963) ; *Harlow v. United States,* 301 F.2d 361, 373 (5th Cir. 1962), cert. denied, 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed.2d 167 (1962) ; *United States v. Paroutian,* 299 F.2d 486, 489 (2d Cir. 1962) ; *United States v. Sheba Bracelets, Inc.,* 248 F.2d 134, 141 (2d Cir. 1957), cert. denied, 355 U.S. 904, 78 S.Ct. 330, 2 L.Ed.2d 259 (1957) ; *Sullivan v. United States,* 95 U.S.App.D.C. 78, 219 F.2d 760, 762 (1955) ; *Somer v. United States,* 138 F.2d 790, 792 (2d Cir. 1943) ; *Parts Manufacturing Co. v. Lynch,* 129 F.2d 841, 842 (2d Cir. 1942), cert. denied, 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541 (1942) ; *In Re Sana-Labs,* 115 F.2d 717, 718 (3rd Cir. 1940), cert. denied, 312 U.S. 688, 61 S.Ct. 615, 85 L.Ed. 1125 (1941).

We therefore hold that since the original illegality did not touch upon the reliability of the testimony of Sam Winns and that the Commonwealth was successful in demonstrating that this source of information would have been discovered without the unlawful police conduct, it was proper to admit his testimony at trial and to introduce the murder weapon that was found as a result of the information supplied by the witness.

Appellant next argues that the court improperly restricted cross-examination of Samuel Winns by refusing to allow the witness to respond to a question concern-

ing the disposition of the criminal charges that had been instituted against him arising out of the same shooting incident. The following colloquy took place at side-bar:

"THE COURT: This question concerning the result of the trial of this defendant, what happened to this defendant is essentially irrelevant in the Court's mind at this juncture, except it being that some aspect of that sentence was utilized for the purpose of influencing his testimony here.[6]

Now, if you seek to determine sentence solely for the purpose of introducing the result of that trial, the objection is sustained.

If you desire, by evidence or otherwise, to show that that sentence or that as a result of some deal, if you like, or whatever, this witness comes here to testify pursuant to that deal with the Commonwealth, I will hear argument or evidence upon that question.

MR. SMITH: The defense's offer, sir, is simply to ask the witness what happened to him. I anticipate that his answer may be, 'I got probation.' *And I intend to leave it alone there, and subsequently in argument, if it ever gets to that stage, suggest that Sam Winns took the course that he did take because Same [sic] Winns himself was much more deeply involved than it would appear.*

THE COURT: Then, under those conditions and under the present status of the record, the objection is sustained."

Counsel further articulated his trial strategy in the brief submitted to this Court.[7] Our review of the record satis-

6. Although the judge said "defendant", he was clearly referring to the witness, Samuel Winns.

7. "While we will certainly concede that the result of Winns' own trial had no bearing on whether or not appellant was guilty of the charges lodged against him, we respectfully submit that the jury was entitled to know what had happened to Winns to assist them in evaluating Winns' credibility. Concededly, the trial Judge would have had to give careful cautionary instructions

fies us that counsel did in fact receive a full opportunity to pursue his intended trial strategy and cannot now complain.

The trial judge properly recognized that the issue involved here is not whether the sentence of probation in and of itself could be used to attack the credibility of the witness, but whether Sam Winns responded to any deal or agreement by coloring his testimony in appellant's trial. The court properly refused to allow speculation that solely because the sentence of probation had been imposed, a deal had been arranged and the witness' testimony was colored thereby. Thus the court invited additional testimony or evidence to provide some basis to support counsel's theory of the witness' bias other than the sentence itself. Counsel refused the court's invitation, but in closing arguments to the jury he observed:

"Now remember Sam Winns? Sam is the guy that said, 'Teddy came to my house, gave me a gun, told me to hold it, told me to go over to his house later on. I went over to his house later on, and in his house later on Teddy told me he shot somebody in the bar.' That's what Sam said.

Now, is Sam to be believed? Does Sam have any reason to lie? Does Sam have anything to gain by blaming Teddy?

He sure does. Where did the police find the gun? They found the gun at Sam's house. Sammy's got the murder weapon. He has to get out of it.

Sammy was arrested and treated as a juvenile in Juvenile Court. He wasn't charged with murder, be-

about the use the jury could make of the information concerning the ultimate disposition of the case against Winns. But simply because cautionary instructions would be required does not mean that perfectly relevant evidence should be excluded. Winns was clearly the principle Commonwealth witness against appellant and his credibility was clearly an issue . . . it is certainly not unknown for a human being to blame another for some incident in order to absolve himself or at least to have himself treated more leniently than might otherwise be the case."

cause you can't be charged with murder in Juvenile Court. Well, you can have some technicalities, you can charge someone with it there, but the case would come over to an adult court for trial. Juveniles don't get tried for murder, they only get tried for lesser offenses.

Sammy was not charged with murder. Sammy was charged with lesser offenses.

.    .    .    .    .    .    .    .

Sammy could have been mistaken. But, he was either telling a lie or he was mistaken, because there's no way on God's green earth that you could be tried as a juvenile if you're over 18. You have to be under 18 to be in Juvenile Court.

.    .    .    .    .    .    .    .

Now Sam had a motive for lying. The police got the gun from Sam's house. Sam got the murder weapon.

Is it possible Sam told the truth? Sure it's possible.

Is it possible that there's another explanation why Sam said that? Darned right there is. He's got the murder weapon, and has to blame somebody for it.

Now, you could take either view of Sam's testimony. As soon as you say that, then what you've also said is that neither view of his testimony can be found to be the truth beyond a reasonable doubt.

.    .    .    .    .    .    .    .

Now I ask you, if in any matter of importance to any one of you, would you trust Sammy Winn? Would that be the kind of person upon whom you would rely for something important, this clown who told you he was a youngster treated in Juvenile Court—pardon me—who told you he was 18, who lied about his age, or at least was mistaken, he could not have been, he couldn't have been at Juvenile Court. This fellow whose case was disposed of in Juvenile Court, so he

has the reason to come in and blame somebody else for doing the actual killing."

Although appellant was restricted in informing the jury of the exact sentence imposed against Winns, the court permitted the widest possible latitude to counsel in argument to attempt to discredit this witness' testimony. We believe that counsel was allowed to fully explore this area and cannot now be heard to complain.

Appellant next challenges the charge of the court in its definition of reasonable doubt. Specifically Brown objects to the use of the word "restrain", and suggests "hesitate" is a more appropriate standard. Appellant concedes that we have addressed and rejected this identical question on several occasions. E.g., *Commonwealth v. Banks*, 454 Pa. 401, 311 A.2d 576 (1973); *Commonwealth v. Cannon*, 453 Pa. 389, 309 A.2d 384 (1973); *Commonwealth v. Pearson*, 450 Pa. 467, 303 A. 2d 481 (1973); *Commonwealth v. Burns*, 409 Pa. 619, 187 A.2d 552 (1963). Appellant has not offered any compelling reasons why we should change the views expressed in the above cited cases.

Finally, appellant asserts that Pa.R.Crim.P. 1116(b) is unconstitutional in that it requires the defense to give its summation speech to the jury first. It is argued that this practice shifts the burden on the defendant to prove himself innocent. Our Court has discussed this attack on Rule 1116(b) and found it to be without merit. *Commonwealth v. Toney*, 439 Pa. 173, 266 A.2d 732 (1970). See also, *Commonwealth v. Jennings*, 442 Pa. 18, 274 A.2d 767 (1971); *Commonwealth v. Gray*, 441 Pa. 91, 271 A.2d 486 (1970).

Judgment of sentence affirmed.

JONES, C. J., and ROBERTS, J., took no part in the consideration or decision of this case.

MANDERINO, J., filed a concurring opinion.

290

MANDERINO, Justice (concurring).

I concur in the majority's affirmance of the judgment of sentence, however, as to the question raised concerning the admissability of the testimony of Samuel Winns and the introduction of the murder weapon, I do so for reasons different than those stated by the majority opinion. In the instant case I am of the opinion that the prosecution has successfully established that the evidence was free of any taint stemming from appellant's illegal arrest because the prosecution established that the evidence in question *was* acquired through an independent source.