608 A.2d 506

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Yvonne A. MASON, Appellant.**

Superior Court of Pennsylvania.

Argued March 10, 1992.

Filed May 4, 1992.

24

Gary Lysaght, Harrisburg, for appellant.

Gloria J. McPherson, Asst. Dist. Atty., Shermansdale, for Com., appellee.

Before POPOVICH, HUDOCK and HESTER, JJ.

POPOVICH, Judge:

We are asked to review the judgment of sentence (aggregating 3 to 6 years imprisonment) for possession with intent to deliver a controlled substance (cocaine), delivery of a controlled substance, possession of a small amount of marijuana, possession of drug paraphernalia and tampering with evidence by the appellant, Yvonne A. Mason. We affirm.

Because the appellant does not question the sufficiency of the evidence, the first issue we will address is whether the court erred in denying the appellant's motion to suppress.

In reviewing such a claim, we must consider only the evidence of the prosecution's witnesses and so much of

the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Kichline,* 468 Pa. 265, 280–81, 361 A.2d 282, 290 (1976). If the record supports the factual findings of the suppression court, as well as the legitimacy of the inferences and legal conclusions drawn from those findings, they may not be disturbed on appeal. *Commonwealth v. O'Bryant,* 479 Pa. 534, 537, 388 A.2d 1059, 1061, *cert. denied,* 439 U.S. 990, 99 S.Ct. 589, 58 L.Ed.2d 664 (1978). "It is, however, exclusively the province of the suppression court to determine the credibility of witnesses and the weight to be accorded to their testimony." *Commonwealth v. Neely,* 298 Pa.Super. 328, 341, 444 A.2d 1199, 1205 (1982).

With the preceding in mind, the suppression transcript discloses that on the afternoon of February 16, 1989, Trooper David S. Laudermilch was in charge of a drug task force providing surveillance for undercover officer Craig LeCadre.

Officer LeCadre met with Kenneth Mitchem to purchase drugs. Based on prior dealings, the police anticipated that Mitchem would travel to the Pennswood apartments in Lower Paxton Township, Dauphin County.

As officer LeCadre waited in his vehicle, Mitchem was observed entering apartment 404–D. Within 12 minutes, Mitchem exited the apartment and the surveillance team followed him to a location approximately a quarter-mile from the Pennswood apartments before arresting him. Thereafter, Mitchem was advised of his rights prior to disclosing information which led police to believe that additional drugs were present at 404–D.

Because Trooper Laudermilch was concerned that Mitchem's arrest may have been observed and reported to the occupants of 404–D, he decided not to wait for the completion of the search warrant by a member of the drug task force, Detective Taylor. Instead, Trooper Laudermilch and other officers returned to apartment 404–D. Once there, police knocked on the door for more than two minutes. When no response was forthcoming, Trooper Laudermilch

gave the order to "knock and announce" that the police were present. In the absence of a response, the police forced the door open with a "battering ram".

After entering the apartment, the police observed the appellant standing in the doorway of the bathroom. She reacted by locking the bathroom door. The police kicked open the door and found the appellant in a crouched position over the toilet.

In the bathroom, the police observed a triple beam scale, a plate on the floor and a silver spoon in the water reservoir of the toilet. These items were left undisturbed, as was a "baggie" containing a white power observed in one of the bedrooms, until Detective Taylor arrived with the warrant. Thereafter, all items were seized.

The motion to suppress was heard immediately before trial. With the close of testimony and argument by counsel, the court concluded that the actions of the police were legitimate and the evidence seized not suppressible. We agree and find the United States Supreme Court decision of *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) instructive.

In *Murray*, based on information received, federal agents placed the defendant and a co-conspirator under surveillance. The two were observed driving separate vehicles into a warehouse. Within minutes, they relinquished the vehicles to other drivers, who in turn were followed and ultimately arrested. The vehicles were seized and found to contain marijuana.

After receiving this information, several agents converged on the warehouse and forced entry. The structure was unoccupied, but numerous burlap-wrapped bales were observed in plain view and found to contain marijuana. However, the agents left without disturbing the bales, kept the warehouse under surveillance and did not reenter until they had a search warrant.

In securing the warrant, no reference was made to the prior entry, and no reliance was had upon any observations

made during the initial entry. When the warrant was issued, approximately 8 hours after the initial entry, federal agents reentered the warehouse and seized several hundred bales of marijuana. This led to the defendants being charged with conspiracy to possess and distribute illegal drugs.

The defendants' motion to suppress was denied by the District Court. The First Circuit Court of Appeals affirmed and certiorari was granted by the United States Supreme Court to resolve the question, left open in *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), of whether a search pursuant to a warrant was tainted by what the police had seen during an initial unlawful entry— marijuana in plain view.

The Supreme Court, in vacating judgment, relied upon the "independent source doctrine", a rule of law intended to condone the introduction of evidence acquired in a fashion untainted by illegal evidence-gathering activity. In applying the doctrine, a balancing approach was adhered to; namely:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in [the] absen[ce of] any error or violation.

*Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984) (Citations omitted; emphasis in original).

The Court in *Murray* extended the policy considerations underlying the "independent source doctrine" to apply to evidence initially discovered during, or as a consequence of, an unlawful search, but later seized as a result of activities untainted by the initial illegality. 487 U.S. at 537, 108 S.Ct. at 2533. And, the Court found that the "inevitable discovery doctrine", with its distinct requirements, was in reality

an extrapolation of the "independent source doctrine": Since the tainted evidence would be admissible if discovered through an independent source, it should be admissible if it inevitably would have been discovered. 487 U.S. at 539, 108 S.Ct. at 2534.

The two principles were applied to the facts in *Murray* thusly:

> Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply. Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one
>
>     \*     \*     \*     \*     \*     \*
>
> The independent source doctrine ... rest[s] upon ... the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied. So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply.

487 U.S. at 541–42, 108 S.Ct. at 2535 (Emphasis in original).

■ As illustrated by *Murray*, the ultimate question is whether the search pursuant to a warrant has a genuinely independent source for its information and the seized tangible evidence. In other words, where a warrantless entry in no way contributes to the issuance of a warrant or the discovery of evidence during the lawful search that occurs pursuant to the warrant, there is no error in the court's refusal to suppress. Id.

The appellant would have us discount the "independent source doctrine" on the grounds that: 1) the police "did not

merely 'secure' the premises, but in fact conducted a search and seized evidence prior to the warrant's arrival"; and 2) the Pennsylvania Supreme Court has not recognized the doctrine as an exception to the exclusionary rule under Article I, Section 8 of the Pennsylvania Constitution. Appellant's Brief at 7.

In responding to the last point first, we find that the "independent source doctrine" is extant and viable in this Commonwealth.

In *Commonwealth v. Cephas*, 447 Pa. 500, 291 A.2d 106 (1972), an admittedly illegal search of the appellant's apartment tainted the seizure of various objects and an incriminating statement from an individual arrested at the site. The *Cephas* Court reversed judgment because there was no "independent source" from which the Commonwealth could have learned of the identity of the individual who provided incriminating information against the appellant other than by "exploiting" the initial illegal search.

Next, in *Commonwealth v. Garvin*, 448 Pa. 258, 293 A.2d 33 (1972), the appellant challenged his identification following an illegal arrest. Even though the arrest was illegal, the Supreme Court validated the subsequent "face-to-face" confrontation between victim and appellant since it had not been " 'come at by exploitation of th[e] illegal[ arrest, but] ... instead by means sufficiently distinguishable to be purged of the primary taint.' " Id., 448 Pa. at 258, 293 A.2d at 33, quoting *Wong Sun v. United States*, 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963).

The Court would not assume "but for" the illegal arrest that appellant would have remained at large indefinitely. On the contrary, it held that "[t]he illegal arrest ... merely provided the means for the confrontation with [the victim] more promptly than would otherwise have been the case." Id.

Similarly, in *Commonwealth v. Brown*, 470 Pa. 274, 368 A.2d 626 (1976), the exclusionary rule did not foreclose the Commonwealth from using the testimony of a witness and a

murder weapon in establishing guilt. The Court held that the information was obtained independent of the appellant's illegal confession. In doing so, the Court wrote:

> ... where the prosecution can establish that the challenged evidence would have come to its attention from an independent source free of the taint, there is not the type of exploitation of the illegality that requires the imposition of the rule of exclusion. Restated, where the evidence obtained as the result of illegal police activity would have been discovered in the course of a lawfully conducted investigation, no purpose is served in applying the exclusionary rule.
>
> *     *     *     *     *     *
>
> "... it is well established that the fruit of unlawful evidence may nevertheless be admitted if the government demonstrates that the evidence would have come to its attention from an independent source...."

Id., 470 Pa. at 284–85, 368 A.2d at 631–32 (Citations omitted). Accord *Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254, 1262 (1989) ("If the prosecution can demonstrate that the allegedly tainted evidence was procured from an independent origin—a means other than the tainted source—the evidence will be admissible. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) ...").

Accordingly, the appellant's argument that the "independent source doctrine" is not viable in this Commonwealth is devoid of merit. Likewise, we hold that the conduct of the police in initially entering the appellant's apartment was not a "search and seizure" but merely an effort to "secure" the premises until a search warrant had been obtained.[1]

---

1. As observed by the United States Supreme Court in *Segura v. United States,* 468 U.S. 796, 806, 810, 104 S.Ct. 3380, 3386, 3388, 82 L.Ed.2d 599 (1984):

    Different interests are implicated by a seizure than by a search. A seizure affects only the person's possessory interests; a search

Instantly, the police had observed Mitchem enter the appellant's apartment for the intended purpose of buying cocaine for undercover agent LeCadre. Upon exiting the premises, Mitchem was arrested approximately ¼ mile from the appellant's apartment. Once advised of his rights, Mitchem told police that there was "additional cocaine back at 404." N.T. 9/19–21/89 at 35.

> affects a person's privacy interests. Recognizing the generally less intrusive nature of a seizure ..., the Court has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been held impermissible.
>
> \* \* \* \* \* \*
>
> The sanctity of the home is not to be disputed. But the home is sacred in Fourth Amendment terms not primarily because of the occupants' *possessory* interests in the premises, but because of their *privacy* interests in the activities that take place within. "[T]he Fourth Amendment protects people, not places."
>
> As we have noted, however, a seizure affects only possessory interests, not privacy interests. Therefore, the heightened protection we accord privacy interests is simply not implicated where a *seizure* of premises, not a search, is at issue. *We hold, therefore, that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents.* \* \* \*
>
> Here, the agents had abundant probable cause in advance of their entry to believe that there was a criminal drug operation being carried on in petitioners' apartment.... The agents had maintained surveillance over petitioners for weeks, and had observed petitioners leave the apartment to make sales of cocaine. Wholly apart from observations made during that extended surveillance, [a co-defendant] had told agents after his arrest ..., that the petitioners had supplied him with cocaine earlier that day, that he had not purchased all of the cocaine offered by Segura, and that Segura probably had more cocaine in the apartment. On the basis of this information, a Magistrate duly issued a search warrant, the validity of which was upheld by both the District Court and the Court of Appeals.... [Citations omitted; emphasis in original]
>
> Here, the police had the appellant's apartment under surveillance and witnessed Mitchem enter it for the purpose of buying cocaine for undercover agent LeCadre. When Mitchem exited with drugs, he was arrested and informed police that he had purchased cocaine from the appellant and there was additional cocaine in the appellant's apartment. This evidence, as in *Segura,* was sufficient to establish probable cause to justify the issuance of a warrant to search apartment 404–D and arrest the appellant.
>
> Of interest to this Court is the fact that the *appellant has not challenged the probable cause section of the search warrant.*

Trooper Laudermilch decided to return to 404–D "for the sole purpose of securing that residence until the search warrant arrived." Id. at 37. The trooper was "greatly concerned" that word would reach the occupants of 404–D that Mitchem had been arrested (given the location of where they assembled to effectuate the arrest—a distance of ¼-mile from Pennswood apartments). As he stated it:

> Well, I was greatly concerned that word would carry back from the location [where] we had assembled and arrested Kenny Mitchem at back to [sic] 404–D Amhurst Drive to alert them in fact that something was aloof [sic] in that area. The location in which Kenneth Mitchem was arrested was one of two main access or entranceways into Pennswood Apartment. It was during the early afternoon hours. It is a high traffic location. One of two main ways leading into there. There were obviously numerous people coming and going in that general area. We also as a result of information I received from Mitchem did ascertain that he had obtained the cocaine supplied to Officer LeCadre on that day's transaction from inside 404–D Amhurst Drive and specifically indicated it was received from the Defendant, Miss Mason. He indicated there were additional quantities present and there were also additional persons present inside that residence at the time making illegal transactions above and beyond an individual by the name of Mr. Whitney being present who was also another occupant of that premise.

N.T. 9/19–21/89 at 36. Additionally, Trooper Laudermilch was "fearful" that additional cocaine may have been exhausted in other sales while he waited for the warrant. Id.

Based on Trooper Laudermilch's concerns, he and other officers returned to Lower Paxton Township and knocked on the appellant's apartment "in excess of two minutes" without a response, even though music could be heard from inside the apartment. This prompted Trooper Laudermilch to announce the police's identity and purpose. Still, there was no response. Consequently, the authorities forced the

door open. Once inside, the police escorted two males and the appellant to the living room section of the apartment. Before they were seated, the couch was checked for weapons.

Moreover, a "cursory" examination of the rooms and closets was conducted for the police's safety. During the course thereof, the police "observed" a baggie in a bedroom containing a white powder, a scale and other drug paraphernalia. None were "seized". Rather, they remained where found (in "plain view") until the warrant was delivered by Detective Taylor 1 hour after the apartment was secured.

Viewing the facts in light of the applicable law, we are satisfied that no basis exists for suppressing the evidence seized.

■ Even though the police observed the triple beam scale, a baggie with a 14–gram "rock" of cocaine, a spoon and plate in "plain view" *prior* to securement of the warrant, the evidence is admissible because of the "inevitability" of its discovery by the police upon executing the validly issued warrant. The same result obtains with regard to marijuana found in the apartment *after* the warrant was executed.

In support of our position, we find the ruling in *Commonwealth v. Ariondo,* 397 Pa.Super. 364, 580 A.2d 341 (1990) to be enlightening. In *Ariondo,* a confidential informant advised police that the appellant was receiving shipments of cocaine via United Parcel Service (UPS). The police alerted UPS to contact them if any packages were addressed to the appellant. This did occur and the police intercepted a package examined by a drug sniffing canine. The dog's reaction signalled that drugs were present. As a result, a search warrant was obtained and cocaine was seized. Thereafter, the bulk of the drug was removed and 12.6 grams were left in the package and resealed.

Before a warrant could be completed, the police, believing (erroneously) that they would not have enough probable cause to obtain a warrant to search the appellant's resi-

dence until after the package had been received, allowed the package to be delivered. The police, fearful that the appellant would notice that the bulk of the cocaine was missing from the package, waited no more than 10 to 15 minutes after UPS' delivery before knocking and announcing their identity. A friend of the appellant opened the door and was advised that the police were securing the residence because narcotics were believed to be present. While in the house, the police conducted a limited protective sweep.

After securing the residence, the police obtained a warrant leading to the seizure of contraband. No evidence, however, had been seized during the warrantless sweep of the home.

Albeit the initial entry could not be justified as consensual or the product of exigent circumstances, the *Ariondo* Court affirmed the denial of the appellant's motion to suppress; *viz.:*

> ... we are satisfied that no basis exists for suppressing the evidence seized from appellant's home. Any evidence that was found for the first time during the execution of the search warrant was admissible pursuant to the Supreme Court's holding in *Segura v. United States, supra.* As for the evidence which had first been observed in plain view following the illegal entry, it was subsequently seized pursuant to a valid search warrant issued independently of observations made during the illegal entry. This evidence would inevitably have been discovered during the subsequent search pursuant to the valid warrant. Therefore, even though appellant's Fourth Amendment rights were violated by the initial illegal entry by police, suppression of the evidence subsequently seized pursuant to the valid search warrant was not constitutionally required. To hold otherwise would be contrary to the purpose of the exclusionary rule, for it would put the police in a worse position than they would have occupied if no violation had occurred. *Murray v. United States,*

*supra* [487 U.S.] at 541, 108 S.Ct. at 2535, 101 L.Ed.2d at 483.

\* \* \* \* \* \*

Instantly, when the search warrant is viewed without reference to the plain view observations which occurred after the illegal entry into appellant's house, it is abundantly clear that the untainted information in the warrant was more than adequate to establish probable cause for the warrant's issuance.

\* \* \* \* \* \*

We conclude, therefore, that the information gained through the initial warrantless entry did not taint the subsequent search which was conducted under authority of a valid search warrant. See: *United States v. Salas, supra* [879 F.2d 530] at 537–539 [ (9th Cir.1989) ]. It follows that the suppression court did not err in refusing to suppress the evidence seized from appellant's home. 397 Pa.Super. at 379–382, 580 A.2d at 349–350 (Citations omitted in part). Accord *Commonwealth v. Frank,* 413 Pa.Super. 273, 280, 605 A.2d 356, 359 (1992) ("It . . . is clear that the fourth amendment does not require suppression of evidence seized from a private residence where, notwithstanding an unlawful entry by police, a warrant subsequently is issued based on independent information known to police before the entry. *See Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)."); *Commonwealth v. Hernandez,* 404 Pa.Super. 151, 590 A.2d 325, 329 (1991) (Evidence seized improperly is admissible where it can be established that it would have been discovered inevitably through an independent and uncorrupted source).

At no time, either pre-trial, post-trial or on appeal, has the appellant questioned the sufficiency of the probable section of the search warrant, nor has she taken steps to insure its inclusion in the official record transmitted to this Court. Both omissions dispense with the need (on waiver grounds) to examine the propriety of the probable cause portion of the warrant. See Pa.R.App.P. 301(a); *Commonwealth v.*

*Gravely,* 486 Pa. 194, 404 A.2d 1296 (1979); *Commonwealth v. Blair,* 460 Pa. 31, 331 A.2d 213 (1975); *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974); *Commonwealth v. Santana,* 321 Pa.Super. 299, 468 A.2d 488 (1983).

However, we would observe that a review of the suppression hearing transcript evinces sufficient probable cause to justify the warranted search of the appellant's premises. Cf. *Commonwealth v. York,* 381 Pa.Super. 55, 552 A.2d 1092, 1094 (1989) ("in this jurisdiction, the two-pronged test of *Aguilar–Spinelli* has been abandoned in favor of the [*Illinois v.*] *Gates*[, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ] "totality of circumstances" test in assessing the sufficiency of the probable cause allegation in a search warrant. *See Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921 (1985).").

More importantly, consistent with this Court's rulings in *Frank,* supra; *Hernandez, supra,* and *Ariondo,* supra, all of which look to *Murray v. United States,* supra, and *Segura v. United States,* supra, to validate evidence seized on the heels of an illegal entry, we find that the police had sufficient probable cause to obtain a warrant to search the appellant's apartment upon information received (from surveillance and Mitchem's statement) evidencing that a crime was being or had been committed and the appellant was the guilty party. *Illinois v. Gates,* supra; *York,* supra; *Commonwealth v. Bardascino,* 210 Pa.Super. 202, 232 A.2d 236, 240 (1967); *Commonwealth v. Ametrane,* 205 Pa.Super. 567, 210 A.2d 902, 904 (1965).

Regardless of the illegality of the original entry, the triple beam scale, the "baggie" of cocaine and spoon were "observed" in plain view, and, thus, would have been discovered independently of the initial entry via an inventory search following the appellant's arrest for delivery of a controlled substance. *Murray v. United States,* supra. Also, the marijuana, being discovered during the execution of the search warrant, was admissible pursuant to the

Supreme Court's holding in *Segura v. United States,* supra. Accord *Melilli,* supra; *Frank,* supra; *Ariondo,* supra.

█ The appellant's second claim attributes the trial court with the commission of error in denying her motion in limine seeking to preclude the prosecution from cross-examining her with regard to prior drug transactions involving Mitchem other than the February 16, 1989, encounter.

At the close of the Commonwealth's case, counsel for the appellant requested a sidebar:

MR. LYSAGHT: ... I would like a ruling in advance, should Yvonne Mason take the stand and testify on her own behalf, I believe that her testimony would essentially be that on the day in question, February 16th, that Ken Mitchem showed up at her apartment, took some, delivered these drugs, took some of these drugs and left with those drugs. That would be her testimony relative to that. * * * I don't know whether her testimony is that he brought them on that day, Your Honor, or immediately prior to. I don't specifically know that would be her testimony, but she would say she got these drugs from Mr. Mitchem and he showed up that day and took some of his or their drugs back. That would be her testimony relative to the delivery charge on the eight ball [cocaine] that Mr. Mitchem delivered to LeCadre.

I would like a ruling limiting the cross-examination by the District Attorney to that transaction alone relative to Yvonne Mason and Mr. Mitchem. In light of the fact that the Commonwealth is not producing Mr. Mitchem as a witness, supported also by the idea, Your Honor, that she has not been charged with any other deliveries and/or conspiracy to deliver any narcotics in this particular case or in any other indictment, but for the charge that we are trying now, Your Honor.

THE COURT: We would not limit the cross-examination to the specific time because if she *opens the door* with respect to her relationship with this man, the D.A. would then have a right to cross-examine her with respect to any other relationship that they may have. The reason

for the limitation in the first place is that the District Attorney indicated they were not producing this witness, and, therefore, we would not permit them to open that can of worms because you did not have an opportunity to cross-examine the witness with respect to the information that they were supporting to offer that ... Mitchem may have had, but if your client wants to testify to her relationship with Mr. Mitchem, she can certainly be cross-examined with respect to whether or not that is the extent of her relationship with Mr. Mitchem. And we would permit that on cross-examination if she wants to testify in that regard.

N.T. 9/19–21/89 at 180–181 (Emphasis added).

We agree with the trial court that the Commonwealth would have been permitted to rebut the appellant's testimony on the issue of *delivering* a controlled substance to Mitchem (⅛ oz. of cocaine, Count II) with evidence of prior dealings between the two. Similar conclusions have been drawn from different fact situations in *Commonwealth v. Bey*, 294 Pa.Super. 229, 439 A.2d 1175, 1178–79 (1982) and *Commonwealth v. Stakley*, 243 Pa.Super. 426, 365 A.2d 1298 (1976).

Where the defendant ... opens the door, to what otherwise might be objectionable testimony, the Commonwealth may probe further to determine the veracity of the trial testimony.

*Bey*, 294 Pa.Super. at 236, 439 A.2d at 1178 (Citation omitted).

Moreover, the evidence objected to by the appellant would have been admissible under an exception to the prohibition against the introduction of prior crimes to prove the crime with which the defendant was charged where doing so evidenced a common scheme, plan or design, or to establish identity.[2] See *Commonwealth v. Donahue*, 519 Pa. 532,

2. The prosecution recounted three prior drug deals involving Mitchem and the appellant. Further, the appellant's counsel argued that the presence of others in the 404–D apartment made it just as likely that Mitchem obtained his drugs from someone other than the appellant.

549 A.2d 121, 125 (1988). Therefore, we find no merit to the appellant's second allegation of trial error.

■ We adopt the trial court's account and response as a proper disposition of the last of the appellant's complaints; to-wit:

During the search of Defendant[']s apartment, the police seized memo paper which had various prices and amounts listed. Some of this same type of paper was found which had been cut into squares and then folded in a particular manner. Printed on one side of the sheets was the corporate logo of the company the Defendant was employed by. During the Commonwealth's case in chief, on direct examination, a detective testified as follows

Q. Now in your experience in law enforcement do these papers signify anything to you?

A. Yes, they do. I have purchased cocaine in similar papers. They are folded, square pieces of paper, folded in the middle. Several other folds are then made and I purchased cocaine in square pieces of paper like this in the center. I have also seized cocaine in similar square folded papers. (N.T. 111–112).

The detective was called for rebuttal at which time an offer of proof was requested. The prosecution indicated that the detective would testify that on Jsnuary [sic] 30, 1989, a drug purchase was made from Defendant[']s apartment complex and that the drugs obtained, were packaged in paper indentical [sic] to that found in Defendant[']s apartment. Defendant['s] objection to the allowance of such testimony was overruled on the basis that it was proper rebuttal to the sisters' [sic] testimony. The detective took the stand and testified along those same lines.

In reference to the detective[']s testimony in this regard, the jury was instructed as follows:

"let me say that although reference was made to a transfer on January 30th, Defendant is not charged with selling drugs on that occasion. The only reasons

that testimony was allowed, was that we thought it had some bearing on the use of these papers that were involved. You heard the testimony from the sister that they used these papers as something for the children in school, and that was the reason why they cut the papers out. She assisted her sister in whatever was going on at school. They drew on the papers, and made designs on these papers.

The Commonwealth's position is that these papers were used to transfer drugs and the officer testified how they would be folded and the process that you heard him testify to. Your responsibility is to decide whether these papers were involved in the transfer of drugs and that is why we allowed a reference to the 30th. According to the testimony of the officer, there was a transfer involving the same kind of paper in the transaction on the 30th. Not to prove she sold drugs on the 30th, but on the question of whether or not these papers may have been used for that purpose, that is why the information was allowed and that is the only basis on which the jury is allowed to consider, whether or not these papers were used in the manner indicated by the officer, to transfer drugs, or used as indicated by the sister, to make designs for the school children or maybe they were used for both purposes. It is a factual judgment that you have to make, and we are not suggesting to you one way or the other how it was used." (N.T. p. 222–3).

Here, the evidence was intially [sic] disallowed, since it would raised [sic] the inference that Defendant was involved in other crimes for which she was not charged. When her sister testified as to the use of the confiscated paper, however, it was properly admitted to rebut her testimony. The jury was specifically told why this evidence was admitted and were instructed not [to] consider it for any other purpose. Defendant['s] claim for relief on this basis must be dismissed.

Trial Court Opinion at 7–8. See also *Bey,* supra; *Commonwealth v. McCloughan,* 279 Pa.Super. 599, 421 A.2d 361, 363 (1980).

For the reasons herein stated, we deny the appellant's requested for a new trial.

Judgment of sentence affirmed.