637 A.2d 251

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Yvonne A. MASON, Appellant.**

Supreme Court of Pennsylvania.

Argued May 4, 1993.

Decided Dec. 30, 1993.

Gary Lysaght, Harrisburg, for appellant.

Richard A. Lewis, Dist. Atty., Richard E. Guida, Deputy Dist. Atty., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

*OPINION OF THE COURT*

FLAHERTY, Justice.

Yvonne Mason was convicted by a jury sitting in the Court of Common Pleas of Dauphin County, Criminal Division, of unlawful delivery of a controlled substance, possession of a controlled substance with intent to deliver, possession of drug paraphernalia, and tampering with evidence. She was sentenced to three to six years. Superior Court affirmed the conviction, 415 Pa.Super. 22, 608 A.2d 506 (1992), and this court granted allocatur to address the question of whether evidence seized during appellant's arrest should have been suppressed.

On February 16, 1989 an undercover police officer met with one Mitchem in order to purchase cocaine. The undercover police officer, Mitchem and an informant proceeded to the Pennswood Apartment Complex in Lower Paxton Township, Pennsylvania, in order for Mitchem to purchase a quantity of cocaine with money which the undercover officer had given him. Another undercover officer observed Mitchem enter apartment 404–D Amhurst Drive and then exit twelve minutes later. Mitchem then entered a car occupied by the undercover officer and the informant, and when the officer exited the car two blocks away, police arrested Mitchem.

Mitchem told police that he purchased the cocaine at apartment 404–D, that more cocaine was present at that location, and that other persons were present making illegal transactions. This information coupled with police surveillance of the apartment supplied probable cause necessary to secure a warrant for apartment 404–D, and while the undercover police team remained behind to keep apartment 404–D under surveillance, one officer left to secure a search warrant.

Before the officer returned with the warrant, another officer on the scene decided to enter apartment 404–D by force in order to secure the occupants and any evidence which might

be present. His purpose, as stated at the suppression hearing, was as follows:

> Well, I was greatly concerned that word would carry back from the location we had assembled and arrested Kenny Mitchem at back of 404–D Amhurst Drive to alert them in fact that something was aloof [sic] in that area. The location in which Kenneth Mitchem was arrested was one of two main access or entrance ways into Pennswood Apartments. It was during the early afternoon hours. It is a high traffic location. One of two main ways leading into there. There were obviously numerous people coming and going in that general area. We also as a result of information I received from Mitchem did ascertain that he had obtained the cocaine supplied to Officer LeCadre on that date's transaction from inside 404–D Amhurst Drive and specifically indicated it was received from the defendant, Miss Mason. He indicated there were additional quantities present and there were also additional persons present inside that residence at the time making illegal transactions....

In short, the officer who directed the forceful warrantless entry to apartment 404–D was fearful that contraband, the cocaine, might have been sold or otherwise destroyed before the arrival of the warrant.

This officer also testified as follows concerning the warrantless entry:

> Myself, Trooper Laudermilch and several detectives went to the front door of Yvonne Mason's residence in the Pennswood Apartments. I initially knocked on the door. I was going to pose as a maintenance man. The other detectives stood off to the side so I was the only one visible through the doorway. We knocked, or I should say I knocked on the door for a least two minutes and we got no response. We could hear music inside. After the two minutes, then we forcibly entered the residence.

\*      \*      \*      \*      \*      \*

Q. When no one responded and you heard loud music inside, what did you do next?

A. We then, right before the entry, we did announce "police, open the door." Then we forcibly opened the door with a battering ram and entered the apartment.

Once inside, police secured two male occupants, but Mason ran into the bathroom and was observed with her hands in the toilet bowl, having flushed the toilet. Next to the toilet bowl, police found a plate and a triple beam scale. They recovered a spoon from the toilet bowl. While some officers detained the three occupants in the living room, others conducted a search of the apartment to insure that no other persons were present. During this search, the officers observed in plain view a plastic bag containing a "rock" of cocaine on the bed. The officers also searched under cushions to insure that no weapons were hidden which might be used against them.

Following arrival of the search warrant, search of one of the men revealed a marijuana cigarette and a cocaine straw; search of the apartment revealed more marijuana in a bedroom, other drug paraphernalia, and drug records and packaging materials. Subsequent to this search, Mason was arrested on the drug related charges mentioned earlier.

■ The sole issue in the case is whether the trial court properly denied Mason's motion to suppress evidence seized in alleged violation of Article I, Section 8 of the Constitution of Pennsylvania.[1] Mason argues that the police entry of her apartment was illegal since it was conducted prior to the issuance of a search warrant, and that the evidence seized should be suppressed, denying police the benefit of an unreasonable seizure. Further, Mason urges that the warrantless entry was conducted without exigent circumstances and while the apartment was under police guard. Finally, Mason as-

1. Article I, Section 8 of the Pennsylvania Constitution provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

serts that if this court is to recognize the "inevitable discovery" and "independent source" doctrines of federal cases, special limitations should be imposed upon these doctrines where private dwellings are concerned and where police conduct is undertaken in bad faith. The federal doctrines at issue provide, in essence, that if the evidence in question inevitably would have been discovered through a source independent of the alleged police misconduct, the evidence is admissible. *See* discussion infra and *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

The Commonwealth, on the other hand, argues that the independent source doctrine is compatible with the Pennsylvania Constitution, that this court has so held, and that the initial police entry did not taint the subsequent search and seizure with a warrant, since the warrant was obtained through probable cause independent of the initial police entry and all of the contraband was seized pursuant to the warrant.

In *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), police forcefully entered a dwelling without a warrant, secured the premises, and arrested the occupants based on contraband they observed in the dwelling after their warrantless entry. The contraband was seized nineteen hours later during a subsequent search pursuant to a warrant. In a case challenging the admissibility of this evidence, the United States Supreme Court held that the contraband was not to be suppressed where the warrant was based on information which had nothing to do with the warrantless entry. As the court explained, "it is clear from our prior holdings that 'the exclusionary rule has no application [where] the Government learned of the evidence 'from an independent source.' '" 468 U.S. at 805, 104 S.Ct. at 3385, 82 L.Ed.2d at 609.

Were the present case to be decided on the basis of Fourth Amendment law, we would be constrained to agree with the Commonwealth that the evidence in the case at bar, like the evidence in *Segura*, should not be suppressed.

Further, we agree with the Commonwealth that the "independent source" doctrine applies in Pennsylvania. In

*Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254 (1989), this court stated:

> If the prosecution can demonstrate that the allegedly tainted evidence was procured from an independent origin—a means other than the tainted sources—the evidence will be admissible.

521 Pa. at 421, 555 A.2d at 1262. In the case at bar, the evidence was procured through execution of a valid search warrant, the issuance of which had nothing to do with the warrantless forced entry into the apartment.

Recently, in *Commonwealth v. Brundidge,* 533 Pa. 167, 620 A.2d 1115 (1993), we addressed the application of the independent source doctrine to particular facts. In that case, a motel cleaning woman alerted management that she had found suspicious items in a vacated room. The items consisted of a map of the front desk area and several one inch clear plastic bags. A state trooper happened to be in the manager's office when the cleaning woman reported her discovery. The manager determined that no one was in the room and at about 12:20 p.m. he asked the trooper to enter. The noon checkout time had passed and the occupants of the room had not re-registered. The trooper observed the map and the plastic bags in plain view. He recognized the bags as the kind used for packaging small quantities of drugs. In the closet the trooper found a jacket with a protective bag over it, and after searching the jacket, he found a small bag which later was determined to contain cocaine. The trooper then telephoned the district attorney to secure a search warrant. At 12:45 p.m. the occupants of the room returned to the motel and re-registered for another night. Subsequently, the room was searched pursuant to the warrant, and Brundidge was arrested and charged, inter alia, with possession of a controlled substance with intent to deliver. Brundidge moved to suppress the controlled substance.

Superior Court held that although police did not violate Brundidge's Fourth Amendment rights when the trooper entered the room, his constitutionally protected right of privacy

was violated when the trooper searched the jacket. This court reversed.

We observed that both the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution protect persons against unreasonable searches and seizures. This right does not depend on a property right in the place of the search, but it does depend on whether the person has a legitimate expectation of privacy in the invaded place. We added that whether the asserted expectation of privacy is constitutionally legitimate will depend on whether it is reasonable in the circumstances.

Using these observations as guides, we noted our agreement with Superior Court that Brundidge had no reasonable expectation of privacy as to any item in plain view within the motel room after checkout time. However, we agreed that Brundidge had a legitimate expectation of privacy in concealed personal effects, even after checkout time:

> The United States Supreme Court has stressed that whether a citizen's enclosed possessions are entitled to Fourth Amendment protection is not dependent on the type of hardware which secures them or the size and sophistication of the container in which they are stored. The Fourth Amendment protects alike the " 'traveler who carries a toothbrush and a few articles of clothing in a paper bag' and 'the sophisticated executive with the locked attache case.' "

533 Pa. at 174, 620 A.2d at 1118–1119. We concluded from this that the search of the jacket should have been accomplished pursuant to a search warrant. We disagreed with Superior Court, however, that evidence obtained from the illegal search must be suppressed, since "it would have been discovered inevitably through an independent source." In other words, there was sufficient information upon which to base a search warrant apart from the cocaine found in the jacket. Our authority for this view was *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

In *Murray*, federal agents illegally forced entry into a warehouse and observed burlap bags in plain view. They left

the warehouse and obtained a search warrant for the warehouse they had illegally entered, but without mentioning the prior entry or their observations made during the entry. The agents then entered the warehouse pursuant to the warrant and seized contraband in the burlap bags. A plurality of the United States Supreme Court found that the seizure was permissible because the search warrant had a source independent from the illegal entry, and the Court stated the question in such cases as:

> whether the search pursuant to a warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Murray*, 487 U.S. at 542, 108 S.Ct. at 2536, 101 L.Ed.2d at 483–84. We then applied the principle of *Murray* to the Brundidge case and determined that because there was sufficient evidence, other than the white powder discovered in the coat, upon which the police would have decided to seek a warrant, the white powder was admissible under the independent source doctrine.

The question in this case, however, is whether the independent source doctrine is applicable to these facts. It is axiomatic, of course, that once a judicially created rule is promulgated, the common law system requires that appellate courts consider this rule in its various factual guises and expand or contract the rule as justice requires.

In the present case, there are significant factual differences from the *Brundidge* case. First, in the present case, the place of invasion is a dwelling place, whereas in *Brundidge* it was a motel room for which registration had expired; second, the mode of entry in the present case was a battering ram, but in the *Brundidge* case, the trooper simply walked through the open door; third, in the present case, there was no reasonable explanation for battering down the door before the warrant

arrived,[2] but in the *Brundidge* case, the trooper entered the motel room after checkout time at the invitation of the manager. These differences are significant, although their exact significance is apparent only upon a more detailed consideration of Pennsylvania's view of the protections which have traditionally been associated with the Fourth Amendment.

The Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Art. I, Sec. 8. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Although the substance of these provisions is similar, the protections afforded by the two constitutions are not identical. In fact, this court has recently had occasion in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), to comment on the purpose of the exclusionary rule under the Fourth Amendment and under Article I, Section 8:

> The history of Article I, Section 8, thus indicates that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the 4th Amendment, as articulated by the majority in *Leon*.

**2.** Were we to accept the police contention that the circumstances of this case were exigent, it is difficult to imagine a case in which the warrantless forcible entry of police would not be excused. It is always possible that criminals may destroy evidence before the police arrive with a warrant, but unless there is something more than the suspicion that such destruction of evidence may occur, the circumstances are not exigent.

The United States Supreme Court in *Leon* made clear that, in its view, the *sole purpose* for the exclusionary rule under the 4th Amendment was to deter police misconduct.... The *Leon* majority also made clear that, under the Federal Constitution, the exclusionary rule operated as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."

.        .        .        .        .

This reinterpretation differs from the way the exclusionary rule has evolved in Pennsylvania since the decision of *Mapp v. Ohio*[, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081] in 1961 and represents a shift in judicial philosophy from the decisions of the United States Supreme Court dating back to *Weeks v. United States*[, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed.2d 652 (1914) ].

\*        \*        \*        \*        \*        \*

In *Commonwealth v. Platou* [455 Pa. 258, 312 A.2d 29 (1973) ] and *Commonwealth v. DeJohn* [486 Pa. 32, 403 A.2d 1283 (1979) ] we made explicit that "the right to be free from unreasonable searches and seizures contained in Article I, Section 8 of the Pennsylvania Constitution is tied into the implicit right to privacy in this Commonwealth." ...

From *DeJohn* forward, a steady line of case-law has evolved under the Pennsylvania Constitution, making clear that Article I, Section 8 is unshakably linked to a right of privacy in this Commonwealth.

\*        \*        \*        \*        \*        \*

Thus, the exclusionary rule in Pennsylvania has consistently served to bolster the twin aims of Article I, Section 8; to-wit, the safeguarding of privacy and the fundamental requirement that warrants shall only be issued upon probable cause.

526 Pa. at 394–98, 586 A.2d at 897–898, 899.

If our sole purpose in applying Article I, Section 8 to the facts of this case were to deter police misconduct, we would be

constrained to rule in favor of the Commonwealth, for in balancing the interests, it is apparent that society's interest in arresting those guilty of serious crime should not be thwarted where police would inevitably and independently arrive at the same evidence, but for their illegal conduct.

However, where our task is not merely to deter police misconduct, but also to safeguard privacy and the requirement that warrants shall be issued only upon probable cause, our conclusion is different. Where the police battering ram is at the door, without exigent circumstances and without a warrant, it is plain that the violent shattering of the door constitutes an unconstitutional invasion of privacy of which every person in this Commonwealth may complain. The requirement that warrants shall issue only upon probable cause means nothing if police are free to batter down the doors of persons who imagine themselves to be secure in their own houses. It is bad enough that some circumstances may require that we approve of bursting through doors at all, but to expand police authority to include battering down doors without a warrant or exigent circumstances, taking the occupants into custody, performing the necessary cursory searches to insure their own safety, and waiting for the arrival of a warrant that they *assume* will be granted, is beyond the bounds of constitutionally acceptable police conduct.[3]

Thus, we hold that where police seize evidence in the absence of a warrant or exigent circumstances by forcibly entering a dwelling place, their act constitutes a violation of Article I, Section 8 of the Pennsylvania Constitution and items

---

**3.** Upon reflection, it is apparent that in the context of the Fourth Amendment, when a court deters police misconduct, it necessarily also safeguards privacy and the probable cause requirement. Why would a court deter police misconduct at all if not to deter police from improperly invading the right of persons to be secure, i.e., private, in their persons, houses, papers and effects? Deterring police misconduct is not an end in itself. The ultimate distinction, then, between the federal and the Pennsylvania analysis is not that the federal courts seek only to deter police misconduct and the Pennsylvania courts seek to protect certain rights, but that the federal courts place less importance than do we on the right of privacy. Therefore, they balance the interests differently and reach a different conclusion as to the relative importance of privacy as against securing criminal convictions.

seized pursuant to their illegal conduct may not be introduced into evidence in a subsequent criminal prosecution.

Order reversed. Judgment of sentence is vacated. The case is remanded for a new trial.

LARSEN, J., did not participate in the decision of this case.

MONTEMURO, J., concurs in the result.

CAPPY, J., joins this opinion and files a concurring opinion.

PAPADAKOS, J., files a dissenting opinion.

CAPPY, Justice, concurring.

I enthusiastically endorse and join the majority opinion.

I write separately to express my continuing disagreement with this Court's decision in *Commonwealth v. Brundidge*, 533 Pa. 167, 620 A.2d 1115 (1993), and to affirmatively welcome the "reining in" of what might have otherwise become an unfettered stampede to apply the "independent source doctrine" in contravention of the clear purposes of Article I, Section 8 of the Pennsylvania Constitution and the exclusionary rule.[1]

The case *sub judice* addresses the question of whether the "independent source doctrine" secures the admissibility of evidence discovered during an illegal, forcible entry and search of a dwelling, when prior to the warrantless entry the searching officers sent fellow attesting officers to a magistrate in order to seek a search warrant which concededly is based upon probable cause.[2] In my view, consideration of the "inde-

---

1. I dissented in *Brundidge* because of my concern that the "independent source doctrine" was being applied where there were serious questions as to whether the "independent source" was truly independent. This Court's application of the "independent source doctrine" under the facts in *Brundidge* created what I believe to be a dangerous precedent, which will only mislead law enforcement officials and encourage police to adopt a "search first, pursue warrant later" mentality.

2. The question is interesting. As the officers in the case *sub judice* sent for the warrant prior to their initial illegal entry of the house, there was no risk of a "search first, pursue warrant later" mentality, as there was in *Brundidge*. However, other concerns remain, as I discuss infra.

pendent source doctrine" under the instant facts raises a serious concern.

Simply stated, I firmly believe that expansion of the applicability of the "independent source doctrine" beyond very narrow and limited circumstances may encourage governmental officials and police officers to adopt a dangerous mindset. If the "independent source doctrine" were applied under the instant facts every police officer in this Commonwealth could rightfully conclude that if he or she first sent for a warrant based upon probable cause, and that warrant were ultimately issued, no evidence seized as a result of an illegal early entry and search without the warrant, would *ever* be suppressed. This potential mindset undermines the fundamental principle that the admissibility of evidence discovered during a warrantless entry without exigent circumstances is the *exception* to the rule rather than the rule itself.

I believe application of the "independent source doctrine" is proper only in the very limited circumstances where the "independent source" is *truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered.* In my view, the "independent source doctrine" can be safely applied under these limited circumstances because I do not believe that the police would risk an illegal entry based upon the remote possibility that a truly independent source will somehow materialize to remove the taint of their illegal entry. Only such limitations on the doctrine can effectively protect from the possibility that police might engage in misconduct without fear of consequence. While acknowledging the applicability of the "independent source doctrine" under these limited circumstances, I feel compelled to state clearly and unequivocally that the "independent source doctrine," as an exception to the exclusionary rule, should not be allowed to swallow the rule itself. I fear, however, that this Court's decision in *Brundidge* has already gone a long way toward sanctioning such a result.

Thus, in the case *sub judice*, I would go further than the majority and hold that except under extraordinarily specific

circumstances which are not present here, i.e., a *truly independent source,* this Court should never tolerate the entry or search of *any* constitutionally protected private place, absent exigent circumstances, without the proper *and prior* issuance of a valid search warrant. Such an illegal entry or search should always result in the application of the exclusionary rule, and the consequent suppression of any evidence discovered as a result of the police misconduct, whether intentional or inadvertent. I am compelled to conclude that the application of the "independent source doctrine" in a situation where the "independent source" is not truly independent of both the tainted evidence itself and the officers involved in the initial illegal search will completely eviscerate the exclusionary rule, failing either to deter police misconduct or to protect individual privacy rights as required by Article I, Section 8 of the Pennsylvania Constitution.

PAPADAKOS, Justice, dissenting.

To deny the existence of an independent source in this case is effectively to define the rule out of existence in our law. I refuse to agree to that and, therefore, I dissent.

Somehow the majority's argument got lost in the thickets of privacy arguments surrounding an entry into a private home. We all agree that the home is almost totally immune to warrantless intrusions. The rule, however, is not absolute, for there are times and circumstances when even the castle wall can be breached without prior judicial approval.

As the majority states correctly (slip opinion, p. 11), the issue here is whether there was a reasonable explanation for forcible entry before the warrant was issued and not whether a right of privacy was present. I conclude from the facts that here the circumstances necessary for a warrantless intrusion did exist, and that the police acted reasonably at the time.

The facts are that an undercover officer and an unsuspecting prospective drug buyer went to an apartment to purchase drugs while observed by another officer. The buyer went inside and emerged with drugs. Then he was arrested. The purchaser told the police that cocaine was being sold inside.

Although a police officer was sent for a warrant, another officer decided to batter down the door without waiting for the arrival of the warrant. Drugs were found inside and arrests took place.

The next step, and the crucial one, was taken when the police crashed inside without awaiting the arrival of the warrant. Here, the fact remains that the officer was supplied with credible independent information that crimes were being committed at that time inside the apartment.

The majority admits that the officer feared that contraband "might have been sold," and that is precisely the point: the police rightly concluded from an independent source, giving rise to probable cause to arrest, that a felony crime was afoot at that very moment. It is the probable cause, based on the independent source, that crime was ongoing which justified the police action.

The majority needlessly confuses warrantless search law with probable cause to arrest law when crimes are in the process of being committed as the facts indicate herein. The logical extension of this confusion would paralyze the authorities from acting upon probable cause to effectuate arrests while criminals are plying their illegal trade at that very moment. That would carry our law to unacceptable and frightening consequences.