J-S69001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| LORIE ANNE KNELLER, | |
| Appellee | No. 193 MDA 2018 |

Appeal from the Order Entered December 29, 2017
In the Court of Common Pleas of Luzerne County
Criminal Division at No(s): CP-40-CR-0000808-2017

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| RICHARD KNELLER, | |
| Appellee | No. 474 MDA 2018 |

Appeal from the Order Entered February 14, 2018
In the Court of Common Pleas of Luzerne County
Criminal Division at No(s): CP-40-CR-0000809-2017

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MURRAY, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: JANUARY 3, 2019**

In these consolidated cases, the Commonwealth appeals from the trial court's orders granting suppression of evidence that was discovered pursuant to a search of the home of Appellees, Lorie Anne and Richard Kneller, by a

police officer who was conducting a welfare check on Appellees' minor child. After careful review, we affirm.

The facts of this case were summarized by the trial court, as follows:

On Friday, January 20, 2017, Officer Evans of the Larksville Police Department received a call to assist Luzerne County Children and Youth to check on the welfare of [Appellees'] seven-year-old son, C.K., at [Appellees'] home…. Residing in the home with [Appellees] and C.K. was … [Appellee Lorie Kneller's] other two sons, fifteen year old L.S., and nineteen year old Austin Feistl (Feistl). Officer Evans and two other police officers arrived and met "Jessica[,"] a Children and Youth employee, at the residence. On Monday of the same week, there had been a report of child abuse stemming from a fight between L.S. and his stepfather, [Appellee] Richard Kneller, at the same residence. Jessica's knock on the door was answered by … []Feistl[]…. Feistl said that C.K. was inside the home, but that his parents, [Appellees]…, were not at home. The officers called [Lorie Kneller], who said she was shopping and doing errands that she would be on her way home. C.K.'s father, Richard Kneller, was contacted but was at work. After waiting for over an hour for [Lorie Kneller] to return home, the officers asked Feistl if they could check on C.K. Officer Evans testified that the door was halfway open and that he could smell a foul smell coming from inside the residence and that even before entering[,] he could see that there were clothes thrown about and that the home was cluttered. After Feistl gave consent to check on C.K.,[2] Officer Evans, his partner Officer Stitzer, and Jessica from Children and Youth entered the "bi-level ranch" home with Feistl. Officer Evans testified that when they went up the steps, the living room, dining room, and kitchen area was all open, and … the first thing he noticed was all the stuff thrown about the house. He said it was "absolutely disgusting" with stains on the carpet and an electric heater plugged into an extension cord. He testified that the space heater was the only source of heat throughout the house. He testified that when he looked straight, he could see into the kitchen area, and … the sink was full of dishes and dirty[,] moldy water. He saw several flies "as if they were Fruit Flies (*sic*) or fleas around." He further testified that before locating C.K., [Feistl] led him down … the hallway[,] which contained three bedrooms and a bathroom. C.K. was not in his bedroom, which happened to be the first bedroom Officer Evans

- 2 -

passed. Officer Evans was able to see inside the first bedroom because there was no door on the hinges. Inside the first bedroom, which belonged to C.K., there was a "kid's bed" and a nightstand or dresser with burnt cigarettes and ashes right on it. C.K. was located in the second bedroom lying on his side on the bed. There was a big screen TV on the bed, and there were "extension cords and stuff" all thrown around the bedroom, which … Officer Evans determined belonged to Feistl. Also on the bed was a fan and a PlayStation and games. There was a second bed inside that bedroom that had "stuff and garbage" thrown on top of it.

> [2] Officer Evans testified that Feistl gave consent for him to check on C.K., but Feistl testified that he told the officers he didn't "feel comfortable" with them coming in to [*sic*] the home, and that instead of verbally consenting, he "just kind of stepped out of the way." We found Officer Evans' version of events to be believable and credible as to the subject of Feistl's consent to check the welfare of C.K.

Even after locating C.K. for his welfare check, the officers continued their tour of the home. The door to the third bedroom, which Officer Evans testified that he believed belonged to … [Appellees], was halfway open and Officer Evans noticed there was a brown carpet with mold stains all over it and "stuff … thrown all over." He then proceeded to the bathroom and turned on the faucet. He testified that he saw "…stains, mold inside the sink, and inside there, no running water." Further, he saw that the toilet had very little water inside, and that the bathroom window was open halfway with no screen. Additionally, he testified that there was no running water in the shower.

Officer Evans said that they then went down the steps and into the basement of the bi-level. In the basement, Officer Evans was able to see clothes thrown around[,] … debris and garbage thrown everywhere[,] and … it "was completely disgusting." He said that when he looked to the left, he saw a door that was closed and a laundry room door that was halfway open. In the laundry room, Officer Evans saw a water heater completely covered with clothes at the base, which he testified was a fire hazard "if there's an open flame inside there." Through the laundry room, Officer Evans checked another bathroom "that was disgusting[,] too[,] with stains and no water, as well." There was another room in the basement that he was unable to access[,] although he tried. He testified that although the door was open slightly, he "had to push

- 3 -

it a little bit, and [he] couldn't get behind it because there was so much clutter behind it."

While going through the residence, Officer Evans photographed all of the areas of the house and took approximately 50 photographs. While discussing the photographs, he showed a picture of the open refrigerator in the kitchen. He showed a picture of the living room area depicting that the baseboard heat had been "taken apart."

Officer Evans requested that the code enforcement officer respond due to fire hazards, no running water in the home, and no safe sleeping area for the children. The home was condemned and C.K. was taken into the protective custody of Children and Youth [Services].

Trial Court Opinion (TCO), 4/26/18, at 1-4 (opinion filed in Lorie Kneller's case; citations to the record omitted).[1]

Based on these facts, Lorie Kneller was arrested and charged with two counts of endangering the welfare of a child (EWOC), 18 Pa.C.S. § 4304(a)(1), and Richard Kneller was arrested and charged with one count of EWOC. On July 6, 2017, Lorie Kneller filed a motion to suppress evidence obtained during the search of her home. A hearing was conducted on August 30, 2017. On December 28, 2017, the trial court issued an order granting the motion in part, and denying it in part. Specifically, the court ruled that:

Officer Evans obtained the consent of Austin Feistl to enter the residence in order to do a welfare check on C.K., but did not request consent to do a search.

　　a. Anything in plain view of the officer is admissible without a warrant to search. ***Commonwealth v. Anderson***, [40] A.3d 1245 (Pa. Super. 2012).

---

[1] The trial court adopted this opinion in Richard Kneller's case, as well. ***See*** Trial Court Opinion, 5/14/18, at 2 (Richard Kneller's case).

> b. Those items that did not fall within the plain view exception to the warrant requirement will be suppressed. Specifically, photographs and testimony regarding any evidence discovered after C.K. was located for his welfare check are not admissible. ***See Arizona v. Hicks***, 480 U.S. 321, 107 S.Ct. 1149 (1987).

Trial Court Order, 12/29/17, at 1 (Lorie Kneller's case). The Commonwealth filed a timely notice of appeal, certifying that the court's order terminates or substantially handicaps the prosecution of Lorie Kneller's case. ***See*** Pa.R.A.P. 311(d).

On January 10, 2018, Richard Kneller filed a motion to suppress that raised the same issues as asserted by Lorie Kneller. On February 8, 2018, the parties agreed to submit the transcript of the August 30, 2017 suppression hearing in Lori's case for the court's consideration in ruling on Richard's motion to suppress. On February 14, 2018, the court issued an order identical to that quoted above, thus granting in part, and denying in part, Richard's motion to suppress. Again, the Commonwealth filed a timely notice of appeal with the requisite certification under Rule 311(d).

In both cases, the trial court issued a Pa.R.A.P. 1925(b) order, notifying the Commonwealth that any issue not raised in a timely-filed statement would be deemed waived. The Commonwealth timely complied with those orders, filing identical Rule 1925(b) statements in both cases, which preserved the following, single issue for this Court's review:

> The [c]ourt erred when it granted [Appellees'] Motion[s] to Suppress because the condition of the house was in plain view or in the alternative would have been inevitably discovered since the

condition of the house provided probable cause to obtain a warrant.

Rule 1925(b) Statement (Lorie Kneller's case), 2/12/18, at 1; Rule 1925(b) Statement (Richard Kneller's case), 3/29/18, at 1.  The trial court issued a Rule 1925(a) opinion on April 26, 2018.

On May 29, 2018, the Commonwealth filed with this Court an "Application for Consolidation" of Lorie Kneller's and Richard Kneller's appeals. This Court granted that application by *per curiam* order on June 11, 2018. The Commonwealth then submitted a single brief, stating the following issue for our review: "Whether the court erred when it suppressed the photographs of the house and any of the observations of the officer after C.K. was located?" Commonwealth's Brief at 3.  Appellees submitted individual briefs thereafter.

Initially, we note that:

> In appeals from orders granting suppression, our scope of review is limited to the evidence presented at the suppression hearing. ***In the Interest of L.J.****,* 622 Pa. 126, 79 A.3d 1073, 1088–89 (2013). Thus, we may consider only the evidence from the appellee's witnesses together with the Commonwealth's evidence that, when read in context of the record at the suppression hearing, remains uncontradicted. ***Id.; Commonwealth v. Whitlock****,* 69 A.3d 635, 637 (Pa. Super. 2013). As for the standard of review, we apply no deference to the suppression court's legal conclusions. ***Whitlock****,* 69 A.3d at 637. In contrast, we defer to the suppression court's findings of fact, "because it is the fact-finder's sole prerogative to pass on the credibility of the witnesses and the weight to be given to their testimony." ***Id.***

***Commonwealth v. Davis***, 102 A.3d 996, 999 (Pa. Super. 2014) (footnote omitted).

Presently, the Commonwealth first avers that the trial court erred by applying Article I, Section 8 of the Pennsylvania Constitution in granting both Appellees' motions to suppress. According to the Commonwealth, both Appellees failed to adequately raise a claim under the Pennsylvania Constitution, instead relying only on the Fourth Amendment to the United States Constitution to support their suppression claims.[2] In support of its waiver argument, the Commonwealth relies on **Commonwealth v. Updike**, 172 A.3d 621 (Pa. Super. 2017). There, we concluded that the suppression court erred by applying Article I, Section 8 of the Pennsylvania Constitution, where Updike had "only moved to suppress the … evidence under the Fourth Amendment of the United States Constitution" in his motion to suppress, and his counsel also "never mentioned the Pennsylvania Constitution at the suppression hearing." **Id.** at 626.

We agree with Appellees that their cases are distinguishable from **Updike**. As they point out, each of them stated in their motions to suppress that, "[u]nder **both the United States and Pennsylvania Constitutions**, there exists 'a reasonable expectation of privacy associated with one's place of dwelling.'" Omnibus Pretrial Motion (Lorie Kneller Case), 7/6/1, at 2 ¶ 10 (emphasis added); Omnibus Pretrial Motion (Richard Kneller), 1/10/18, at 2 ¶

---

[2] We recognize that the Commonwealth did not raise this specific claim in its Rule 1925(b) statement. However, it was not clear until the trial court issued its Rule 1925(a) opinion that the court had based its suppression ruling on Pennsylvania constitutional law, rather than its federal counterpart. Therefore, we will not deem the Commonwealth's first issue waived.

10. Lorie reiterated this quote in her brief in support of her motion to suppress that was filed after the suppression hearing. Also, in Lori's brief, she relied on *Commonwealth v. Edwards*, 735 A.2d 723 (Pa. Super. 1999), which was a decision premised on Article 1, Section 8 of the Pennsylvania Constitution. *See* Lorie Kneller's Brief at 9 (citing Brief in Support of Defendant's Omnibus Pretrial Motion, 9/13/17, at 2-3); *see also Edwards*, 735 A.2d at 725. Admittedly, neither Lorie nor Richard provided elaborate discussion about the differences between the federal and Pennsylvania 'inevitable discovery' doctrines, which is the central issue the Commonwealth raises on appeal (as will be discussed herein). However, the Commonwealth did not raise its inevitable discovery claim until it filed its briefs in opposition to Appellees' omnibus pretrial motions, which were filed after the suppression hearing and subsequent to Appellees' briefs.

Thus, we conclude that Appellees' references to the Pennsylvania Constitution distinguishes their cases from *Updike*, and were sufficient to support the trial court's reliance on Pennsylvania constitutional law in granting their motions to suppress.

Next, the Commonwealth avers that the trial court erred by granting suppression of the evidence discovered during Officer Evans' search of Appellees' home after he located C.K., because that evidence would have been inevitably discovered by lawful means.[3] More specifically, the Commonwealth

---

[3] The Commonwealth does not dispute that Officer Evans' warrantless search of Appellees' home after he located C.K. was illegal.

- 8 -

initially contends that the code enforcement officer would have inevitably conducted a lawful search of Appellees' home.

We need not delve into the details of the Commonwealth's argument, however, as our review of the record demonstrates that it is waived. The Commonwealth did not raise this claim in either of the briefs it filed in response to Appellees' omnibus pretrial motions, and it does not point to where in the record of the suppression hearing it preserved this inevitable discovery argument. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Additionally, the Commonwealth's Rule 1925(b) statement, quoted *supra*, did not set forth a claim that the code enforcement officer would have inevitably discovered the evidence; instead, the Commonwealth asserted that the evidence would have been "inevitably discovered *since the condition of the house provided probable cause to obtain a warrant*." Rule 1925(b) Statement (Lorie Kneller's case) at 1 (emphasis added); Rule 1925(b) Statement (Richard Kneller's case) at 1 (emphasis added). The trial court addressed only this probable cause issue in its opinion, and made no mention of the code enforcement officer's inevitably discovering the evidence. Accordingly, the Commonwealth failed to preserve this claim for our review. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not

included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").[4]

Finally, the Commonwealth challenges the trial court's rejection of its argument that the evidence obtained during Officer Evans' illegal search of Appellees' home would have been inevitably discovered because Officer Evans possessed probable cause to obtain a warrant. Having reviewed the Commonwealth's argument, Appellees' responses, the certified record, and the applicable law, we discern no error in the trial court's decision on this issue, based on the rationale set forth in its April 26, 2018 opinion. **See** TCO at 8-14. Accordingly, we adopt that portion of the trial court's decision as our

---

[4] In any event, we also would deem this argument meritless. In **Commonwealth v. Berkheimer**, 57 A.3d 171 (Pa. Super. 2012) (*en banc*), we held that, "where law enforcement officers engage in apparent misconduct by negating the warrant requirement, the Commonwealth only can avoid suppression by demonstrating a source 'truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct.'" **Commonwealth v. Perel**, 107 A.3d 185, 195 (Pa. Super. 2014) (discussing and quoting **Berkheimer**, 57 A.3d at 176). Here, the code enforcement officer was called to the scene by Officer Evans, based on the apparent code violations discovered during the officer's illegal search of Appellees' home. The Commonwealth presented no evidence at the suppression hearing - such as the code officer's testimony - to establish that the code officer would have legally inspected Appellees' home, but for Officer Evans' illegal search and report of information to the code officer. Thus, we would conclude that the Commonwealth failed to establish that the code enforcement officer was a 'truly independent source' who would have inevitably discovered the evidence in Appellees' home.

own, and affirm the order granting Appellees' suppression motions on this basis.[5]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/03/2019

---

[5] We add, however, that the Commonwealth's cursory argument that the present cases are distinguishable from the two cases primarily relied upon by the trial court, **Berkheimer** and **Perel**, is wholly unconvincing. **See** Commonwealth's Brief at 12-14. The Commonwealth focuses its argument on inconsequential differences between the facts of those cases and the present. However, the trial court did not premise its reasoning on the facts of **Berkheimer** or **Perel** but, instead, on the legal principles that emerged from those decisions.

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
OF LUZERNE COUNTY- <u>CRIMINAL</u>

vs. :

LORIE A. KNELLER : NO. 808 OF 2017

## <u>Pa.R.A.P. 1925(a) OPINION</u>

### I. Factual and procedural history.

The Commonwealth appeals from the December 28, 2017 Order of this court, which granted in part the Defendant's Motion to Suppress the Search of the Residence and Evidence Secured Therefrom. Defendant Lorie Kneller (Defendant) was charged with two counts of endangering the welfare of her own children due to the condition of her home.[1] The Commonwealth filed its Notice of Appeal on January 26, 2018, and a Statement of Errors Complained of on Appeal (Statement) on February 12, 2018. Defendant filed her Response (Response) on February 26, 2018.

On Friday, January 20, 2017, Officer Evans of the Larksville Police Department received a call to assist Luzerne County Children and Youth to check on the welfare of Defendant's seven-year-old son, C.K., at Defendant's home in Larksville Borough. N.T. 2, 5. Residing in the home with Defendant and C.K. was Richard Kneller (C.K.'s father), and Defendant's other two sons, fifteen year old L.S., and nineteen year old Austin Feistl (Feistl). Officer Evans and two other police officers arrived and met "Jessica", a Children and Youth employee, at the residence. Id. at 3-4. On Monday of the same week, there had been a report of child abuse stemming from a fight between L.S. and his stepfather, Richard Kneller, at the same residence. Id. at 4. Jessica's knock on the door was answered by Defendant's nineteen year old son (Feistl) who lives in the home. Id. at 4-5. Feistl said that C.K. was inside the home, but that his parents, Defendant and Richard

---

[1] Defendant was charged with two counts of Endangering Welfare of Children, 18 Pa.C.S.A. § 4304 (a)(1), a felony of the third degree, one count for each of two minor children, C.K. and L.S.

1

Kneller (in fact not Feistl's natural father), were not at home. Id. at 5. The officers called Defendant, who said she was shopping and doing errands and that she would be on her way home. Id. at 6. C.K.'s father, Richard Kneller, was contacted but was at work. Id. After waiting for over an hour for Defendant to return home, the officers asked Feistl if they could check on C.K. Id. at 6, 24. Officer Evans testified that the door was halfway open and that he could smell a foul smell coming from inside the residence and that even before entering he could see that there were clothes thrown about and that the home was cluttered. Id. at 7. After Feistl gave consent to check on C.K.,[2] Officer Evans, his partner Officer Stitzer, and Jessica from Children and Youth entered the "bi-level ranch" home with Feistl. Id. Officer Evans testified that when they went up the steps, the living room, dining room, and kitchen area was all open, and that the first thing he noticed was all the stuff thrown about the house. Id. at 8. He said it was "absolutely disgusting" with stains on the carpet and an electric heater plugged into an extension cord. Id. at 8. He testified that the space heater was the only source of heat throughout the house. Id. at 16. He testified that when he looked straight, he could see into the kitchen area, and that the sink was full of dishes and dirty moldy water. He saw several flies "as if they were Fruit Flies (sic) or fleas around." Id. at 8. He further testified that before locating C.K., Austin led him down to the hallway which contained three bedrooms and a bathroom. Id. C.K. was not in his bedroom, which happened to be the first bedroom Officer Evans passed. Id. at 8-9. Officer Evans was able to see inside the first bedroom because there was no door on the hinges. Id. at 9. Inside the first bedroom, which belonged to C.K., there was a "kid's bed" and a nightstand or dresser with burnt cigarettes and ashes right on it. Id. at 9. C.K. was located in the second bedroom lying on his side on the bed. There was a big

---

[2] Officer Evans testified that Feistl gave consent for him to check on C.K., but Feistl testified that he told the officers he didn't "feel comfortable" with them coming in to the home, and that instead of verbally consenting, he "just kind of stepped out of the way." N.T. 32. We found Officer Evans' version of events to be believable and credible as to the subject of Feistl's consent to check the welfare of C.K.

2

screen TV on the bed, and there were "extension cords and stuff" all thrown around the bedroom, which bedroom Officer Evans determined belonged to Feistl. Id. at 8-9. Also on the bed was a fan and a PlayStation and games. Id. at 15. There was a second bed inside that bedroom that had "stuff and garbage" thrown on top of it. Id.

Even after locating C.K. for his welfare check, the officers continued their tour of the home. Id. The door to the third bedroom, which Officer Evans testified that he believed belonged to the Defendant and her husband, Richard Kneller, was halfway open and Officer Evans noticed there was a brown carpet with mold stains all over it and "stuff all thrown all over." Id. at 10. He then proceeded to the bathroom and turned on the faucet. Id. at 10, 14. He testified that he saw "all stains, mold inside the sink, and inside there, no running water." Id. at 10. Further, he said that the toilet had very little water inside, and that the bathroom window was open halfway with no screen. Id. Additionally, he testified that there was no running water in the shower. Id.

Officer Evans said that they then went down the steps and into the basement of the bi-level. Id. In the basement, Officer Evans was able to see clothes thrown around and debris and garbage thrown everywhere and that it "was completely disgusting." Id. He said that when he looked to the left, he saw a door that was closed and a laundry room door that was halfway open. Id. In the laundry room, Officer Evans saw a water heater completely covered with clothes at the base, which he testified was a fire hazard "if there's an open flame inside there." Id. at 10-11. Through the laundry room, Officer Evans checked another bathroom "that was disgusting too with stains and no water, as well." Id at 11. There was another room in the basement that he was unable to access although he tried. Id. He testified that although the door was open slightly, he "had to push it a little bit, and [he] couldn't get behind it because there was so much clutter behind it." Id.

3

While going through the residence, Officer Evans photographed all of the areas of the house and took approximately 50 photographs. Id. at 11-12. While discussing the photographs, he showed a picture of the open refrigerator in the kitchen. Id. at 15. He also showed a picture of the living room area depicting that the baseboard heat had been "taken apart." Id. at 16.

Officer Evans requested that the code enforcement officer respond due to fire hazards, no running water in the home, and no safe sleeping areas for the children. Id. at 11, 17. The home was condemned and C.K. was taken into the protective custody of Children and Youth. Id. at 17.[3]

Defendant was arrested and charged with the aforementioned offenses. Defendant filed an omnibus pre-trial motion, seeking in pertinent part the suppression of the search of the residence and evidence secured therefrom. We granted Defendant's motion in part and directed that since Officer Evans obtained the consent of Feistl to enter the residence in order to do a welfare check on C.K., but did not request consent to conduct a search, anything in plain view of the officer while he was looking for C.K. was admissible without a warrant. Conversely, those items that did not fall within the plain view exception to the warrant requirement were suppressed. Specifically, we ordered that photographs and testimony regarding any evidence discovered after C.K. was located for his welfare check were not admissible.

## II. Law and discussion.

In its Statement, the Commonwealth alleges that this Court erred in granting the Defendant's Motion to Suppress because either the condition of the house (1) was in plain view or, in the alternative (2) would have been inevitably discovered since the condition of the house provided probable cause to obtain a warrant. We will address each argument in turn.

---

[3] L.S., the other minor child, was staying with his natural father and was not taken into protective custody.

4

The Commonwealth first alleges that this Court erred because the condition of the house was in plain view. Generally, a search warrant is required before police may conduct any search. "Absent the application of one of a few clearly delineated exceptions, a warrantless search or seizure is presumptively unreasonable. This is the law under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution." Commonwealth v. Williams, 73 A.3d 609, 614 (Pa. Super. 2013). The plain view doctrine is an exception to the warrant requirement, and provides that evidence in plain view of the police can be seized without a warrant. Commonwealth v. Anderson, 40 A.3d 1245, 1248 (Pa. Super. 2012), quoting Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971).

The plain view doctrine permits the warrantless seizure of an object if: (1) the police did not violate the Fourth Amendment when they arrived at the vantage point from which they could view the items in question; (2) the items were not obscured and could be seen from the investigator's location; (3) the incriminating nature of the items was "readily apparent"; and (4) police had a "lawful right to access the items." Anderson, at 1248.

While they were attempting to locate C.K., the police did not violate the Fourth Amendment because they had Feistl's consent to enter the residence. The Pennsylvania Supreme Court has held that "[t]hird party consent is valid when police reasonably believe a third party has authority to consent." Commonwealth v. Strader, 931 A.2d 630, 634 (Pa. 2007). When a third party who has the authority to consent does so, police are not required to obtain a search warrant based upon probable cause. Commonwealth v. Hughes, 836 A.2d 893, 900 (Pa. 2003). Feistl was a nineteen year old adult residing in the home and was able to give consent for the police to enter the residence. However, the consent given by Feistl was limited in scope as he only consented to allow the police to check on C.K. "The scope of a search is generally defined by its expressed

5

object." Commonwealth v. Parker, 619 A.2d 735, 739 (Pa. Super. 1993). In Parker, the defendant gave consent for police to search his car for "drugs or other contraband" or for "drugs and other violations of law." Id. at 737. After police seized a cassette tape, the defendant was charged with violating Pennsylvania's Wiretapping Act. In reversing the suppression court, the Superior Court stated that the tape was beyond the scope of the defendant's consent. Id. at 739.

In the case before us, the record reflects that Officer Evans obtained Feistl's consent to enter the residence in order to do a welfare check on C.K, but did not request consent to do a search. Id. at 6. Defense counsel questioned Officer Evans regarding the scope of consent:

Q: When you said you were granted permission to go, no, you basically told him you were going to go in, didn't you?

A: No. I said, Do you mind, can we check to make sure he's okay? He said, Sure. Absolutely. He's sleeping in the bedroom.

Q: So, specifically you asked him if he can check on his brother, you didn't ask him –

A: That was the reason we were there.

Q: You didn't ask him to search the residence, did you?

A: No.

Q: So the consent was just to see if his brother was okay?

A: Correct.

N.T. at 24.

Before Officer Evans located C.K. for his welfare check, all four requirements were satisfied and anything in plain view of the officers up until the point that C.K. was located is admissible under the plain view exception. The officers had permission to be in the house in order to do the welfare check. The testimony as to what Officer Evans saw prior to locating C.K.

6

indicates that what he saw was not obscured and that the incriminating nature of the items was readily apparent. On the other hand, any evidence discovered after C.K. was located for his welfare check did not satisfy the test in order for the plain view exception to apply and is properly suppressed. After C.K. was located, Officer Evans did not have permission to continue to be at the residence. Additionally, the turning of the faucets and pushing on the doors indicates that the evidence he was searching for was "obscured".

Specifically, as our Order stated, photographs and testimony regarding any evidence discovered after C.K. was located for his welfare check are not admissible. This includes, but is not limited to, evidence of Officer Evans looking into rooms after C.K. was located (N.T. 9-11); entering rooms after C.K. was located (N.T. 10-11); looking in the toilet (N.T. 10, 13-14); testing the toilet (N.T. 13-14); walking through the basement[4] (N.T. 10); turning on faucets (N.T. 10-11, 14); checking to see if the shower had running water (N.T. 10); and pushing on a door -- which was only slightly open -- to try to get behind it. (N.T. 11). *See*, Arizona v. Hicks, 480 U.S. 321 (1987). (When a bullet was fired through the floor of defendant's apartment, police entered the apartment to search for the shooter, other victims, and for weapons. While there, a police officer noticed two sets of expensive stereo components and, suspecting that they were stolen, moved some of them to read and record the serial numbers and seized a stolen turntable. The serial numbers were not subject to the plain view exception because the moving of the equipment was a "search" separate and apart from the search that was the lawful objective of entering the apartment.)

---

[4] Because Officer Evans testified that the home was a bilevel, it would appear that after locating C.K., the officer would have had to go down the first set of stairs and pass the front door and go down a second set of steps to reach the basement, which he then proceeded to search, entering the laundry room and the bathroom and pushing on a door in the basement in an attempt to gain access to another room. (N.T. 10). Although Officer Evans testified that Feistl led them through the home, the court finds that Feistl did not voluntarily initiate and lead a tour of the rest of the home after C.K. was located.

7

Alternatively, the Commonwealth argues that the condition of the house would have been inevitably discovered since the condition it was in provided probable cause to obtain a warrant. Having probable cause to obtain a search warrant does not negate an otherwise illegal search. Commonwealth v. Berkheimer, 57 A.3d 171, 174 (Pa. Super. 2012) (*en banc*); Commonwealth v. Perel, 107 A.3d 185, FN 11 (Pa. Super. 2014)

The exclusionary rule has traditionally barred from trial physical, tangible materials obtained during -- or as a direct result of -- an unlawful invasion. Wong Sun v. United States, 371 U.S. 471, 485 (1963).

The inevitable discovery exception to the exclusionary rule provides that:

> Evidence which would have been discovered was sufficiently purged of the original illegality to allow admission of the evidence. [I]mplicit in this doctrine is the fact that the evidence would have been discovered despite the initial illegality. If the prosecution can establish by a preponderance of the evidence that the illegally obtained evidence. . . inevitably would have been discovered by lawful means, the evidence is admissible. The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct.

Commonwealth v. Bailey, 986 A.2d 860, 862 (Pa. Super. 2009), appeal denied, 995 A.2d 350 (Pa. 2010), citing Commonwealth v. Gonzalez, 979 A.2d 879, 889 (Pa. Super. 2009).

The United States Supreme Court announced the inevitable discovery exception to the exclusionary rule in Nix v. Williams, 467 U.S. 431 (1984), holding that evidence discovered after a defendant was questioned in violation of his Sixth Amendment rights is admissible where the prosecution can establish by a preponderance of the evidence that the information inevitably would have been discovered by lawful means. Id. at 448.

According to the Supreme Court, the sole purpose for the exclusionary rule under the 4th Amendment was to deter police misconduct. U.S. v. Leon, 468 U.S. 897, 916 (1964). However,

8

due to the protections contained in Article I, Section 8 of the Pennsylvania Constitution,[5] the purpose of the exclusionary rule in Pennsylvania is quite different from the federal exception. Commonwealth v. Mason, 637 A.2d 251, 256 (Pa. 1993). In Mason, our Supreme Court introduced privacy considerations stemming from Pennsylvania's constitution as an element of inevitable discovery:

> If our sole purpose in applying Article I, Section 8 to the facts of this case were to deter police misconduct, we would be constrained to rule in favor of the Commonwealth, for in balancing the interests, it is apparent that society's interest in arresting those guilty of serious crime should not be thwarted where police would inevitably and independently arrive at the same evidence, but for their illegal conduct. However, where our task is not merely to deter police misconduct, but also to safeguard privacy and the requirement that warrants shall be issued only upon probable cause, our conclusion is different.

Mason, at 256.

In its Statement, the Commonwealth claims that the condition of the house would have been inevitably discovered since the condition it was in provided police with probable cause to obtain a warrant. However, even if the police did have probable cause to obtain a warrant, the Superior Court in Perel rejected that argument, making it clear that "the inevitable discovery doctrine is not a substitute for the warrant requirement." Commonwealth v. Perel, 107 A.3d 185, 196 (Pa. Super. 2014). In Perel, the defendant's girlfriend consented to a search of her apartment and of the defendant's shaving bag. Although the Superior Court determined that the defendant's girlfriend could not properly consent to a search of his shaving bag, the Dissent argued that the evidence contained in the bag should still be admissible under the inevitable discovery doctrine.

---

[5] The Pennsylvania Constitution provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant. Pa. Const. art. 1, § 8.

The Perel court held that the warrantless search of the defendant's private belongings in closed containers in his girlfriend's apartment did not fall within the "narrow confines" of the inevitable discovery doctrine, even if police had probable cause and could have obtained a warrant. The Perel court soundly rejected the same argument that the Commonwealth makes here. The court was clear that police cannot seize an item or search a home and then invoke the inevitable discovery doctrine with the assertion that they could have obtained a warrant, emphasizing that "the inevitable discovery doctrine does not operate in such a constitutionally impoverished manner." Perel, at 196.

In reaching the conclusion that the inevitable discovery doctrine did not apply, the Perel court considered the Superior Court's in-depth analysis of the doctrine in Commonwealth v. Berkheimer. Perel, at 193. In Berkheimer, the stepfather of an individual who was wanted on a probation detainer provided an address where he might be located. Commonwealth v. Berkheimer, 57 A.3d 171, 174 (Pa. Super. 2012) *(en banc)*. After arriving at the address late at night, the police smelled marijuana and entered the home without a warrant. Id. at 175. Inside the home, they observed the defendants (but not the individual who had been wanted on the detainer.) Id. Additionally, police observed marijuana, drug paraphernalia, and several rounds of ammunition. Id. The police then got a warrant, and in a search pursuant to the warrant they found three small bags of marijuana and a scale. Id. at 176. The suppression court agreed with the defense argument that the search of the home was unlawful. However, the suppression court held that because the smell of marijuana provided probable cause for the issuance of a warrant, the evidence inevitably would have been discovered. Id. at 176-177.

On appeal, an *en banc* panel of the Superior Court considered the extent to which "the evidence in question was subject to inevitable discovery under the independent source rule and

10

should therefore be properly admitted." Id. at 178. The court held that the evidence obtained pursuant to the search warrant should have been suppressed. Id. at 176-177. The Berkheimer court further held that where police "engage in apparent misconduct by negating the warrant requirement, the Commonwealth only can avoid suppression by demonstrating a source truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct." Perel at 195.

As in Berkheimer and in Perel, the Commonwealth cannot meet this standard here. Only one team of police participated in the extended walk-through of Defendant's residence. There was no source independent from that police team. The evidence indicated that all of the police officers acted together during the search. The record offers no justification that would have allowed the police to continue to proceed wholesale through Defendant's home after C.K. was located -- entering rooms, turning on faucets, and pushing on doors. Although the facts of Berkheimer and Perel may differ from the facts of the instant case, the guiding principle is the same. As the Perel court summed up, "A fair reading of Berkheimer, in which the *en banc* panel reviewed all of the leading cases in this area, demonstrates that the principle that possessing probable cause to obtain a warrant is insufficient to overcome illegal searches **applies broadly to all search and seizure cases.**"[6] Perel, at n.11 (emphasis supplied).

The idea that law enforcement officers may remove the need to secure a search warrant based upon their own determination that sufficient probable cause exists is incompatible with the

---

[6] As in the instant case, police did not use any force in Perel to enter the premises they searched, obtaining the defendant's girlfriend's consent to enter her apartment. In holding that the seized evidence should be suppressed, the court demonstrated that police need not violently enter a premises in order for the procedural safeguards of the warrant requirement to apply.

11

protections provided by the Fourth Amendment. Perel at 196. As stated by Justice Robert Jackson in Johnson v. United States, 333 U.S. 10, 14 (1948):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity[.]

Id. at 14 (footnote omitted), quoted by Perel, at 196.

The Commonwealth's argument that the condition of the house would have been inevitably discovered since the condition it was in provided probable cause to obtain a warrant does not excuse the absence of the issuance of a warrant by a detached and neutral fact finder, where exigent circumstances did not exist. Even if the police had developed probable cause while performing C.K.'s welfare check, that does not excuse them from getting a warrant to conduct a more exhaustive, wholesale search. Exigent circumstances did not here exist and, moreover, the Commonwealth did not argue that they did.

The doctrine of inevitable discovery should not be viewed as an invitation to overlook unconstitutional searches whenever the police could have complied with the Constitution's warrant requirement, but instead consciously disregarded it. Perel, at 195. Police must demonstrate that the evidence **would** have been discovered absent the police misconduct, not simply that they somehow **could** have lawfully discovered it. Id. at 196. (emphasis in original).

The burden of proving that evidence would have been inevitably discovered rests with the Commonwealth. Commonwealth v. Ingram, 814 A.2d 264, 272 (Pa. Super. 2002). The Commonwealth suggests two different scenarios as the basis for the application of inevitable discovery in the instant matter. In its Brief in Opposition to Defendant's Omnibus Pretrial Motion,

12

the Commonwealth argues that the inevitable discovery doctrine applies because if the officers had waited for Defendant to arrive home rather than entering the home when they did, "one of two things would have happened: either the Defendant would have given consent for the officers to enter the home at that time, or the Defendant would have refused to give consent to the officers to enter." The Commonwealth argues that if the Defendant had given consent, the officers would have found the residence in the same condition it was in during the initial search. Alternatively, the Commonwealth posits, if on arriving home the Defendant had refused permission to allow the police to check on C.K., the officers would then have been in an "exigent circumstances situation" where the Defendant was preventing law enforcement from assessing C.K.'s welfare, and they would have had the ability to enter the home to check on C.K., and again would have inevitably discovered the condition of the home.

While arguing this hypothetical, alternate reality in which the search after locating C.K. would have been lawful, no evidence was presented that Defendant would have either refused access to the child or would have given consent to search the home. There was no evidence presented that Defendant would have agreed, or even that she would have been asked by the police, to give greater consent than the limited consent given by Feistl. As the defense argues in their Response, a third possibility would have been that the Defendant would have arrived home and brought C.K. to the investigators *outside* the home. Yet another possibility is that Defendant would only have been asked for -- and only would have given -- consent to check on the welfare of C.K. rather than to a wholesale search of the home. None of these scenarios trigger the application of the inevitable discovery doctrine. The Commonwealth has simply failed to meet its burden.

The warrantless search of Defendant's bathrooms, third bedroom, basement, and the other locations in the residence that were searched after C.K. was located was improper, despite the

13

Commonwealth's argument that the police had probable cause. After C.K. was located, the police no longer had consent to be on the premises. The fact that police may have developed probable cause during the period of time they were looking for C.K. does not excuse the requirement that they get a warrant to conduct a more thorough search. Perel makes it clear that the Commonwealth cannot invoke the inevitable discovery doctrine by merely asserting that the police could have obtained a warrant. Therefore, this court submits that it did not err in suppressing evidence discovered after C.K. was located for the welfare check and respectfully suggests that the Order of this Court be affirmed.

**ORDER ATTACHED SEPARATELY AS PAGE 15**

14